OPINION OF THE COURT
Pigott, J.
Defendant Lewiston Golf Course Corporation (Lewiston Golf) is an indirect, wholly owned subsidiary of the Seneca Nation of Indians, a federally recognized Indian tribe. We are asked to decide whether that corporation is protected from suit by the Seneca Nation’s sovereign immunity. Applying the factors set out in Matter of Ransom v St. Regis Mohawk Educ. & Community Fund (86 NY2d 553 [1995]), we hold that it is not.
*542 L
In 2002, the Seneca Nation’s legislative body, the Tribal Council, granted a corporate charter to Seneca Gaming Corporation (Seneca Gaming), under the laws of the Seneca Nation, to develop, finance, operate and maintain gaming facilities. Seneca Gaming is wholly owned by the Seneca Nation. In the same year, again under the laws of the Seneca Nation, the Tribal Council granted a corporate charter to Seneca Niagara Falls Gaming Corporation (Seneca Niagara), created as a wholly owned subsidiary of Seneca Gaming, to develop, finance, operate and conduct the business of the Nation’s gaming operations in Niagara County specifically. Seneca Gaming and Seneca Niagara are two of the most financially successful revenue-producing assets of the Seneca Nation.
Lewiston Golf was incorporated in June 2007, under the laws of the Seneca Nation, as a wholly owned subsidiary of Seneca Niagara, to develop, finance, operate and conduct the business of an 18-hole golf course in the Town of Lewiston. The following month, it acquired real property from Seneca Niagara, on which to construct the golf course. The property is not part of any Indian reservation and is not sovereign land.
As Lewiston Golfs predecessor had explained in its application to Niagara County Industrial Development Agency for tax abatements and deferrals,[1] it was “looking to create a championship level public/semi-private golf course offering the millions of visitors [to] the Niagara Falls region and the patrons of the Seneca Niagara Casino & Hotel a new tourist destination project that will attract golf enthusiasts from Canada and the United Statest,] and to capitalize on the growing tourist market, which will create new jobs and allow for prolonged stays in the area.”
In resolving to authorize the creation of Lewiston Golf, the Tribal Council stated that
“the Lewiston Golf Course [would] be developed and operated as an amenity to [Seneca Niagara]’s casino operations, together with the casino’s lodging, dining, retail and entertainment amenities, the *543 purpose of which amenities is to enhance the overall success and profitability of the casino’s operations consistent with the powers described in [Seneca Niagara]’s charter and the purposes for which [Seneca Niagara] was formed . . .
“[T]he use of a separate corporation or legal entity to own and operate the Lewiston Golf Course is advisable due to various legal and accounting considerations, including the status of the Lewiston Golf Course as an off-territory business venture of the Nation, subject to legal, tax and other requirements that are not applicable to the Nation’s on-territory business . . .
“[T]he Nation desires to establish Lewiston Golf ... as a separate legal entity, governmental instrumentality of the Nation, and wholly-owned subsidiary of [Seneca Niagara], for the purpose of developing and operating the Lewiston Golf Course in the Town of Lewiston, New York, and legally doing business in such jurisdictions.”
Lewiston Golfs charter describes in detail the nature of the relation between it and the Seneca Nation. The charter provides that
• “[n]o activity of [Lewiston Golf] nor any indebtedness incurred by it shall encumber, implicate or in any way involve assets of the Nation or another Nation Entity not assigned or leased in writing to [Lewiston Golf]”
• “the Nation shall not be liable for the debts or obligations of [Lewiston Golf], and [Lewiston Golf] shall have no power to pledge or encumber the assets of the Nation”
• “[t]he Obligations of [Lewiston Golf] shall not be a debt of the Nation or of [Seneca Gaming] or any other Nation-chartered Gaming corporation” and
• “[Lewiston Golf] shall not have . . . any power ... to borrow or lend money on behalf of the Nation, or to grant or permit or purport to grant or permit any right, lien, encumbrance or interest in or on any of the assets of the Nation.”
On the other hand, the Boards of Directors of Lewiston Golf, Seneca Gaming, and Seneca Niagara are identical, are appointed by the Tribal Council, and during this dispute were composed entirely of enrolled members of the Seneca Nation. Lewiston Golf, like Seneca Gaming and Seneca Niagara, is required by its *544 charter to obtain approval from the Seneca Nation before undertaking significant expenditures of resources or personal property; adopting, amending, or repealing corporate bylaws; providing significant guarantees or incurring significant liabilities; lending money to other Seneca Nation entities; buying, selling, or encumbering real property; entering into financing arrangements involving securities; or entering into, performing, or canceling contracts with any government or government agency. Lewiston Golf, like Seneca Gaming and Seneca Niagara, must keep detailed corporate and financial records and submit for the Seneca Nation’s approval an annual statement of its financial condition. And Lewiston Golf, once again like Seneca Gaming and Seneca Niagara, is required to receive consent from the Seneca Nation before taking such legal actions as commencing a lawsuit, consenting to a court’s jurisdiction, or waiving a claim to sovereign immunity.
IL
In the summer of 2007, plaintiff Sue/Perior Concrete & Paving, Inc. (Sue/Perior) entered into a contract with Lewiston Golf, whereby Sue/Perior would build a golf course on the property, for the sum of $12,700,000. However, the business relationship between Sue/Perior and Lewiston Golf deteriorated in 2009. Sue/Perior demanded payment of certain bills; Lewiston Golf insisted that Sue/Perior was seeking remuneration for work not done or exaggerating its costs. Sue/Perior filed mechanic’s liens, the third of which is in the amount of $4,130,538, for materials furnished and labor performed.
Sue/Perior commenced this foreclosure action against Lewiston Golf and other defendants in June 2010, with respect to that mechanic’s lien. Lewiston Golf counterclaimed for willfully exaggerated lien, fraud, breach of contract, and unjust enrichment. Sue/Perior subsequently amended its complaint to add additional defendants — Seneca Niagara, Seneca Gaming, and 15 corporate officers and directors — and to assert additional causes of action for breach of contract, breach of implied covenant of good faith and fair dealing, quantum meruit, promissory estoppel, and fraud.[2]
*545 Seneca Niagara, Seneca Gaming, Lewiston Golf and the individual defendants moved to dismiss Sue/Perior’s complaint pursuant to CPLR 3211, alleging protection from suit under the sovereign immunity of the Seneca Nation. Supreme Court denied the motion to dismiss, ruling, as pertinent here, that Lewiston Golf did not qualify as an “arm” of the Seneca Nation. Lewiston Golf appealed. For its part, Sue/Perior withdrew claims against all defendants except Lewiston Golf.
The Appellate Division affirmed Supreme Court’s order, as modified in a manner not relevant here (109 AD3d 80 [4th Dept 2013]). In ruling that Lewiston Golf lacked sovereign immunity, the Appellate Division relied on our decision in Matter of Ransom. There, we set out factors for courts to consider when deciding whether a tribal subagency or a corporate entity affiliated with an Indian tribe is entitled to sovereign immunity, as the tribe itself is. The Appellate Division found that most of the Ransom factors, and in particular those that the Ransom court “characterized as the £[m]ore important ]’ financial factors, weigh in favor of a determination that [Lewiston Golf] does not share in the Nation’s sovereign immunity” (109 AD3d at 88, quoting Ransom, 86 NY2d at 559 [some brackets in Appellate Division opinion]). The Appellate Division noted, for example, that “[Lewiston Golf]’s charter clearly provides that [Lewiston Golf] has no power to bind or otherwise obligate the funds of the Nation” and that “the record is devoid of evidence that a lawsuit against [Lewiston Golf] would adversely impact the Nation’s treasury either directly or indirectly” (109 AD3d at 91).
With respect to the non-financial factor comparing Lewiston Golfs purposes with those of the Nation, the Appellate Division found that statements by the Tribal Council and the documents Lewiston Golf submitted to the Industrial Development Agency in support of its request for economic assistance
“reflect that the purpose of [Lewiston Golf] ... is several steps removed from the purposes of tribal government . . .
££[T]he central purpose of the golf course project was not to provide funds for traditional governmental programs or services but, rather, was to serve as a regional economic engine . . .
*546 “Notably absent is any reference to improving the quality of life on reservation lands, creating jobs for Native Americans living on the reservation, or generating funds to support educational, social, or other government-related programs for tribal members” {id. at 89-90).
Finally, the Appellate Division observed “that declining to extend sovereign immunity to [Lewiston Golf] under the circumstances of this case will not diminish the policies underlying tribal sovereign immunity. . . . Here, permitting [Lewiston Golf] to retreat behind the Nation’s cloak of sovereign immunity after it held itself out as an independent, market-participating entity subject to the jurisdiction of the State of New York, including its courts, would discourage non-Indians from entering into business relationships with the Nation’s corporations, which may well retard the Nation’s economic growth and undermine one of the purposes of its sovereign immunity” (109 AD3d at 92 [internal quotation marks, citation and brackets omitted]).
The Appellate Division granted Lewiston Golf leave to appeal to this Court, certifying the question whether its order was properly made. We now affirm and answer the certified question in the affirmative.
III.
Indian tribes possess the common-law immunity from suit traditionally enjoyed by sovereign powers, unless waived. In Matter of Ransom, we set out several factors[3] for courts to use to determine whether an entity, such as a corporation or agency, that is affiliated with an Indian tribe has the right to claim sovereign immunity against suit.
“Although no set formula is dispositive, in determining whether a particular tribal organization is an ‘arm’ of the tribe entitled to share the tribe’s immunity from suit, courts generally consider such factors as whether: [1] the entity is organized under *547 the tribe’s laws or constitution rather than Federal law; [2] the organization’s purposes are similar to or serve those of the tribal government; [3] the organization’s governing body is comprised mainly of tribal officials; [4] the tribe has legal title or ownership of property used by the organization; [5] tribal officials exercise control over the administration or accounting activities of the organization; and [6] the tribe’s governing body has power to dismiss members of the organization’s governing body. More importantly, courts will consider whether [7] the corporate entity generates its own revenue, whether [8] a suit against the corporation will impact the tribe’s fiscal resources, and whether [9] the subentity has the power to bind or obligate the funds of the tribe. The vulnerability of the tribe’s coffers in defending a suit against the subentity indicates that the real party in interest is the tribe.” (Ransom, 86 NY2d at 559-560 [internal quotation marks, citations and brackets omitted].)
Applying these factors, we held in Ransom that the St. Regis Mohawk Education and Community Fund — a nonprofit corporation, organized under the District of Columbia Nonprofit Corporation Act, providing educational, health care, social and historical services to residents of the St. Regis Mohawk Reservation in Franklin County — was a tribal entity that enjoyed sovereign immunity from suit. We explained that “[t]he Fund was established to enhance the health, education and welfare of Tribe members, a function traditionally shouldered by tribal government. Additionally, the Fund received its resources from the Tribe, and the Tribe was designated by the Fund as the recipient of its funds and services. Critically, under its by-laws, the Fund’s governing body may only be comprised of elected Chiefs of the Tribe. Thus, the Fund’s provision of social services on behalf of and under the direct fiscal and administrative control of the Tribe renders it an entity so closely allied with and dependent upon the Tribe that it is entitled to the protection of tribal sovereign immunity” (id. at 560).
We begin our discussion of the present appeal with the functions or purposes factor. The question is whether Lewiston Golfs purposes are similar to, or serve, those of the Seneca Nation. The Appellate Division reasoned that Lewiston Golf’s purposes are significantly different from those of tribal govern *548 ment, because Lewiston Golf has functioned to develop an amenity outside the Seneca Nation’s reservation land that would serve as a regional economic engine, not to promote tribal welfare on the reservation directly.
Lewiston Golf and the dissent rely on Kiowa Tribe of Okla. v Manufacturing Technologies, Inc. (523 US 751 [1998]), in which the Supreme Court of the United States held that “[t]ribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation” (523 US at 760). In Kiowa Tribe, a private party sued an Indian tribe for defaulting on a promissory note, and asked the courts to limit tribal immunity to suits involving conduct on reservations or involving noncommercial activities. The Supreme Court refused to create a “reservation” or a “commercial activity” exception to the doctrine of tribal sovereign immunity from suit. Recently, a sharply fractured Supreme Court declined to revisit that decision (see Michigan v Bay Mills Indian Community, 572 US —, 134 S Ct 2024 [2014]).
Lewiston Golf contends that it is inconsistent with Kiowa Tribe to treat the fact that an Indian tribe’s subsidiary engages primarily in commercial activities not located on the tribe’s reservation as evidence that the subsidiary is not an “arm” of the tribe. We disagree. Kiowa and Bay Mills do not apply in the present appeal, because they concerned lawsuits against Indian tribes themselves, not against corporate affiliates of tribes. They do not illuminate questions concerning whether such an entity is an “arm” of the tribe. The United States Supreme Court has never held that corporations affiliated with an Indian tribe have sovereign immunity.
As the Appellate Division notes, the primary purpose of creating the golf course in Lewiston was to act as a regional economic engine and thereby serve the profit-making interests of the Seneca Nation’s casino operations in the area. While this may result in more funds for government projects on the Seneca Nation’s reservations and elsewhere that benefit members of the tribe, we agree with the Appellate Division that the purposes of Lewiston Golf were sufficiently different from tribal goals that they militate against Lewiston Golf’s claim of sovereign immunity. However, the purposes factor of Ransom is not determinative, and we proceed to discuss the other criteria. While some of the remaining Ransom factors favor the conclusion that Lewiston Golf is protected by sovereign immunity, the most important ones strongly support the opposite conclusion.
*549 IV
It is true that Lewiston Golf was organized under tribal law, not federal law, and that Lewiston Golf’s governing body is comprised of tribal officials. The Seneca Nation controls Lewiston Golfs Board of Directors, which is made up exclusively of enrolled members of the Nation appointed by the Tribal Council. Moreover, it is clear from the record that tribal officials exercise control over the administration or accounting activities of Lewiston Golf, and that the tribe’s governing body has power to dismiss members of Lewiston Golfs governing body. Indeed, the Tribal Council has exclusive authority to remove members of Lewiston Golf’s Board. These considerations indicate that Lewiston Golf is dependent on the Seneca Nation in a manner that might suggest it partakes in the Nation’s sovereign immunity.
However, all the remaining Ransom factors, and particularly those that consider the financial relationship between the subsidiary or agency and the Indian nation, support the conclusion that Lewiston Golf lacks sovereign immunity.
First, the Seneca Nation does not have legal title or ownership of the golf course being developed by Lewiston Golf. Contrary to the Seneca Nation’s contention, the question posed by this factor is not whether Lewiston Golf is owned by the tribe. Rather, the issue is whether the property used by Lewiston Golf is owned by the tribe, and the record leaves no room for doubt that the owner of the golf course is Lewiston Golf, not the Seneca Nation.
Next, and most significantly, the record firmly indicates the intent to ensure that a suit against Lewiston Golf will not impact the Seneca Nation’s fiscal resources. The founding charter provided that no indebtedness incurred by it would “in any way involve assets of the Nation,” which would “not be liable for the debts or obligations” incurred by Lewiston Golf. The charter stated that Lewiston Golf would have no power to allow “any right, lien, encumbrance or interest in or on any of the assets of the Nation.” All the evidence in the record points to the conclusion that Lewiston Golf lacks the power to bind or obligate the funds of the Seneca Nation.
In response, Lewiston Golf does not deny that the statements in the charter have their ordinary meaning and that the Seneca Nation intended to create a corporation for whose debts it would not be liable. Lewiston Golf does not contend that the Seneca *550 Nation’s independent coffers are vulnerable. Rather, it argues that a lawsuit against Lewiston Golf would have an economic impact on the Seneca Nation because revenues that would otherwise be distributed to the Nation will not be available. Lewiston Golf expressly concedes that it generates its own revenue, rather than being dependent on the resources of the Seneca Nation.
Whether Lewiston Golf’s revenues will become part of the Seneca Nation’s resources, as Lewiston Golf emphasizes, is beside the point. The test, with respect to the financial relationship factors of Ransom, is not the indirect effects of any liability on the tribe’s income, but rather whether the immediate obligations are assumed by the tribe. Here, the financial obligations were assumed by Lewiston Golf and any liability insurer, not by the Seneca Nation.
These financial relationship considerations are the most important of the Ransom factors, as we noted when we first set out the criteria (see Ransom, 86 NY2d at 559). In attributing such weight to them, we have taken into consideration federal precedent on the Eleventh Amendment immunity of States. While the sovereign immunity of an Indian tribe is not based on the Federal Constitution, it has in common with Eleventh Amendment immunity “a background of traditional ideas about the power and privileges of the sovereign” (Runyon v Association of Vil. Council Presidents, 84 P3d 437, 440 n 12 [Alaska Sup Ct 2004]; see Thebo v Choctaw Tribe of Indians, 66 F 372, 376 [8th Cir 1895]). In considering whether an entity is an “arm” of an Indian tribe, the most significant factor is the effect on tribal treasuries, just as “the vulnerability of the State’s purse” is considered “the most salient factor” in determinations of a State’s Eleventh Amendment immunity (Hess v Port Authority Trans-Hudson Corporation, 513 US 30, 48 [1994]).
If a judgment against a corporation created by an Indian tribe will not reach the tribe’s assets, because the corporation lacks “the power to bind or obligate the funds of the tribe” (Ransom, 86 NY2d at 559 [internal quotation marks and brackets omitted]), then the corporation is not an “arm” of the tribe. However, if a tribe is legally responsible for a corporation’s obligations, the tribe is “the real party in interest” (id. at 560). As the Supreme Court of Alaska has observed, in a thoughtful opinion, “a tribe might, for commercial purposes, wish to form a corporation exposed to suit in order to cultivate trust with business partners. . . . The tribes’ use of the corporate form *551 protects their assets from being called upon to answer the corporation’s debt. But this protection means that they are not the real party in interest” (Runyon, 84 P3d at 441; accord e.g. American Prop. Mgt. Corp. v Superior Court, 206 Cal App 4th 491, 506, 141 Cal Rptr 3d 802, 813-814 [4th Dist, Div 1 2012]; Uniband, Inc. v Commissioner of Internal Revenue, 140 TC 230, 255 [2013]; Seaport Loan Prods., LLC v Lower Brule Community Dev. Enter. LLC, 41 Misc 3d 1218[A], 2013 NY Slip Op 51765[U] [Sup Ct, NY County 2013]).[4] In short, protection of a tribal treasury against liability in a corporate charter is strong evidence against the retention of sovereign immunity by the corporation.
The dissent’s principal objection to our ruling is that lower courts have found that Seneca Gaming and Seneca Niagara have sovereign immunity (see dissenting op at 556-560, citing Sue/Perior Concrete & Paving, Inc., 99 AD3d 1203; Seneca Niagara Falls Gaming Corp., 2005 WL 3510348, 2005 Conn Super LEXIS 3295; Warren v United States, 859 F Supp 2d 522 [WD NY 2012], affd 517 Fed Appx 54 [2d Cir 2013]; Myers v Seneca Niagara Casino, 488 F Supp 2d 166 [ND NY 2006]). Neither this Court nor the United States Supreme Court has so held, and our decision today may imply the opposite. As noted above, the question whether a corporate affiliate of an Indian tribe is protected by the tribe’s sovereign immunity has not been settled by the United States Supreme Court.[5] Therefore, even assuming that it is a pure question of federal law, we remain at liberty to answer it in a manner that may conflict with the determinations of courts in our federal circuit. Contrary to the dissent, New York State courts are not bound by the decisions of federal courts, other than the United States Supreme Court, on questions of federal constitutional law (see Arthur Karger, Powers of the New York Court of Appeals § 1:8 at 18 [3d ed rev 2005]). It is well-established that “the interpretation of a Federal constitutional question by the lower Federal courts may serve as useful and persuasive authority for our Court while not binding us. This Court in its long-standing tradition and indepen *552 dent responsibility has exercised its correlative adjudicative power on questions of Federal law” (People v Kin Kan, 78 NY2d 54, 60 [1991] [citation omitted and emphasis added], citing New York R.T. Corp. v City of New York, 275 NY 258, 265 [1937] [noting that a decision of the Second Circuit, “while entitled to great weight, is not binding on this court”], affd 303 US 573 [1938]; see also e.g. People v Konstantinides, 14 NY3d 1, 13 [2009]; Matter of Mason [State Commn. on Jud. Conduct], 100 NY2d 56, 58 [2003]). The same principle applies here.
Alternatively, it could be argued that Seneca Gaming and Seneca Niagara are distinguishable from Lewiston Golf in that their purposes are more closely aligned with those of the Seneca Nation. In any case, that question is not before us, and the dissent simply begs the question, assuming — what has not been held by this Court or the Supreme Court — that Lewiston Golfs corporate parents have sovereign immunity.
In conclusion, we agree with the Appellate Division that the most significant Ransom factors count against sovereign immunity on the part of Lewiston Golf. Its ruling was proper. It is unnecessary for us to address the parties’ remaining contentions.
Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.

. The application was approved, and eventually Lewiston Golf and the Niagara County Industrial Development Agency entered into a payment-in-lieu-of-tax agreement, providing for Lewiston Golf to make payments in lieu of taxes, as well as a lease agreement and leaseback agreement. In this manner, Lewiston Golf was granted certain exemptions from real property and sales taxes.

. Sue/Perior also commenced a separate action against Seneca Gaming, Seneca Niagara, and certain individual defendants — but not Lewiston Golf-alleging tortious interference with contract, tortious interference with prospective business advantage, concerted action, and prima facie tort (punitive *545 damages). The Appellate Division dismissed Sue/Perior’s complaint (Sue/Perior Concrete & Paving, Inc. v Seneca Gaming Corp., 99 AD3d 1203 [4th Dept 2012]). We take no position on whether that appeal was properly decided.

. Some commentators justifiably refer to our “nine factors” (see e.g. Gregory J. Wong, Note & Comment, Intent Matters: Assessing Sovereign Immunity for Tribal Entities, 82 Wash L Rev 205, 220 [2007]), but the last two, or last three, factors have often been treated as one by courts citing Ransom, generating an eight-factor or seven-factor test (see e.g. Seneca Niagara Falls Gaming Corp. v Klewin Bldg. Co., Inc., 2005 WL 3510348, 2005 Conn Super LEXIS 3295 [Jud Dist of New London 2005, No. KNL-CV-05-4004218-S]). We too treat the last three factors as closely interrelated.

. While the Alaska Supreme Court’s opinion concerned a nonprofit corporation shielding members from liability under state law, not tribal law, its analysis is equally pertinent here in that the Seneca Nation created a corporation with a charter expressly protecting the Nation from liability.

. Nor has it been addressed by the United States Court of Appeals for the Second Circuit, which treated the question cursorily in a summary order that lacks precedential force (517 Fed Appx 54 [2013]; see Local Rules of 2d Cir rule 32.1.1 [a] [providing that decisions “by summary order do not have precedential effect”]).