Filed 12/22/16

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE ex rel. JAN LYNN OWEN, )
as Commissioner, etc., )
　 )
　 )
　　Plaintiff and Appellant, )
　 )　　　　　　　　　　S216878
　v. )
　 )　　　　　Ct.App. 2 B242644
MIAMI NATION ENTERPRISES et al., )
　 )　　　　　Los Angeles County
　　Defendants and Respondents. )　　Super. Ct. No. BC373536
_____ )

　　The practice of short-term deferred deposit lending — often called "payday" or "cash advance" lending — generally involves small sums that become due on the borrower's next payday. In return for the loan, the borrower provides the lender with a personal check for the amount of the loan plus fees or with direct access to his or her checking account. The lender then waits a specified amount of time to deposit the borrower's check or debit his or her account — hence the deferred deposit. Because of the short-term nature of these loans and the relatively high fees involved, effective annual percentage rates of 700 percent or higher are not unusual.

　　In 2003, the Legislature enacted the California Deferred Deposit Transaction Law (Fin. Code, § 23000 et seq.), which limits the size of each loan and the fees that lenders may charge. In response to this law and similar legislation in other states, some deferred deposit lenders sought affiliation with

federally recognized Indian tribes, which are generally immune from suit on the basis of tribal sovereign immunity. (See generally Martin & Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* (2012) 69 Wash. & Lee L.Rev. 751 (hereafter Martin & Schwartz).)

In this case, a pair of federally recognized tribes created affiliated business entities. Those entities or their subsidiaries then provided deferred deposit loans through the internet to borrowers in California under terms that allegedly violated the Deferred Deposit Transaction Law. The question is whether these tribally affiliated entities are immune from suit as "arms of the tribe." Applying a test that takes into account both formal and functional aspects of the relationship between the tribes and their affiliated entities, we conclude that the entities are not entitled to tribal immunity on the record before us.

## I.

This case concerns business entities associated with two Indian tribes, the Miami Tribe of Oklahoma and the Santee Sioux Nation.

The Miami Tribe of Oklahoma is a federally recognized tribe. (79 Fed. Reg. (Jan. 24, 2014) 4748, 4750.) In 2005, it created Miami Nation Enterprises, Inc. (hereafter MNE), as a "subordinate economic enterprise of the Miami Tribe of Oklahoma." In 2008, MNE created MNE Services, a wholly owned subsidiary of MNE that is incorporated under tribal law. Shortly thereafter, MNE transferred Tribal Financial Services (TFS), its "financial lending" subdivision, to MNE Services. MNE Services holds tribal licenses to engage in the "cash advance service business" under the names Ameriloan, United Cash Loans, and U.S. Fast Cash.

The Santee Sioux Nation, located in northeastern Nebraska, is also a federally recognized tribe. (79 Fed. Reg. (Jan. 24, 2014) 4748, 4751.) In 2005,

the tribe passed a resolution creating SFS, Inc. (hereafter SFS), "an economic and political subdivision of the Santee Sioux Nation." According to its articles of incorporation, SFS "is organized . . . to facilitate the achievement of goals relating to the Tribal economy, self-government, and sovereign status of the Santee Sioux Nation" by "provid[ing] and/or administer[ing] short-term loans and cash advance services ('payday loans') and associated services." The tribe has issued licenses to SFS to "conduct a cash advance and lending business" under the names Preferred Cash and One Click Cash. These lenders provide "cash advance services, or short-term loans, to eligible borrowers . . . and the loan transactions are approved and consummated on Indian lands and within the jurisdiction of the Santee Sioux Nation."

Although the tribes and their business entities are based in Oklahoma and Nebraska, they offer deferred deposit loans through the internet to borrowers nationwide. In August 2006, the Commissioner of the California Department of Corporations (now Commissioner of Business Oversight) issued a desist and refrain order to various online deferred deposit lenders, including defendants here, directing them to cease "engaging in unlicensed deferred deposit transaction business." The lenders did not heed the desist and refrain order.

In June 2007, the Commissioner filed a complaint against the lenders in Los Angeles Superior Court, alleging violations of the Deferred Deposit Transaction Law and seeking injunctive relief, restitution, and civil penalties. According to the complaint, defendants made deferred deposit loans without a license, issued loans in excess of the $300 statutory maximum, charged borrowers unlawful fees, and violated the Commissioner's desist and refrain orders. MNE and SFS specially appeared and moved to quash service based on lack of jurisdiction. They asserted that Ameriloan, United Cash Loans, U.S. Fast Cash, Preferred Cash, and One Click Cash are merely trade names utilized by tribal

3

entities immune from suit without their consent. The parties then conducted discovery regarding the relationship among the tribes, their subsidiary business entities (i.e., MNE and SFS), and the online deferred deposit lenders to determine whether the lenders were sufficiently related to the tribes to benefit from the application of sovereign immunity.

The Commissioner adduced evidence that a company called CLK Management, LLC, registered the trademarks to Ameriloan, United Cash Loans, U.S. Fast Cash, One Click Cash, and similar names between 2004 and 2006. In September 2006, one month after the Commissioner issued her desist and refrain orders, CLK Management conveyed the One Click Cash trademark to SFS. CLK Management also conveyed the Ameriloan, United Cash Loans, and U.S. Fast Cash marks to TFS, which later assigned them to MNE Services. The Commissioner requests that we take judicial notice of screenshots from the homepages of Ameriloan, United Cash Loans, U.S. Fast Cash, Preferred Cash Loans, and One Click Cash, as well as information from the United States Patent and Trademark Office regarding each of those trade names. We grant this unopposed request, because the information is publicly available and is "not reasonably subject to dispute." (Evid. Code, § 452, subd. (h).)

The parties also produced documents relating to the entities' operations. Those documents show that since its creation in 2005, SFS has hired a series of management companies to operate its deferred deposit lending businesses. Initially, SFS contracted with Universal Management Services (UMS), a nontribal corporation. Since 2008, SFS "has contracted with AMG Services, Inc. (AMG), a corporation wholly-owned by the Miami Tribe of Oklahoma, for the purpose of providing employees to provide loan servicing." MNE likewise contracted with UMS before the creation of AMG; today, AMG provides employees to service the loans issued by MNE Services. AMG subsequently acquired CLK Management,

4

the company that initially registered many of the lenders' trade names. According to declarations from tribal officials, some loan approval and customer service operations are run from MNE and SFS offices.

Under their prior service agreements with UMS, which were in effect until 2008, MNE and SFS received 1 percent of gross revenues from the online lending operations. The record does not reveal what percentage of revenues MNE Services and SFS currently receive under their agreements with AMG. Affidavits from Santee Sioux tribal officials state that "[a]ll profits earned by SFS go to the Santee Sioux to help fund government operations and social welfare programs." The Miami Tribe likewise asserts that "[t]he profits from [MNE Services] flow back to the Miami Tribe and enable it to fund critical governmental services."

The Commissioner also introduced evidence regarding two brothers, Scott and Blaine Tucker, who were linked to the companies SFS and MNE hired to manage the tribal entities' lending activities. Neither Scott nor Blaine is a member of the Santee Sioux or Miami Tribe. Scott, who had been the president of CLK Management, later became a signatory on AMG's bank accounts along with his brother Blaine. An investigator from the Federal Trade Commission (FTC) analyzed AMG's business checking account and found "numerous payments that appear to be for personal interests," including expenses associated with Scott's personal residence in Aspen, Colorado, and "sponsorships" of his auto racing team. In addition, Scott and Blaine were authorized to sign checks in the name of SFS, and during a sample two-month period reviewed by an investigator from the California Department of Justice, either Scott or Blaine signed every check issued by MNE Services. A law firm with ties to the Tucker brothers paid the website domain registration fees for all of the online deferred deposit lenders at issue here. A federal court has recently ruled that Scott, AMG, and several Tucker-affiliated companies violated several federal lending laws and imposed a $1.3 billion

judgment in addition to injunctive relief. (See *Federal Trade Com. v. AMG Services, Inc.* (D.Nev. Sept. 30, 2016, No. 2:12-cv-00536) 2016 WL 5791416.)

After discovery, MNE and SFS renewed their motion to quash. On May 10, 2012, the trial court held an evidentiary hearing, granted the motion to quash, and dismissed the case on the basis of tribal immunity. The Commissioner appealed.

The Court of Appeal identified the key question as whether the lending businesses are "sufficiently related to their respective tribes to be protected by tribal sovereign immunity." In answering that question, the court found significant that "MNE was created directly under the Miami Tribe's tribal law as a subordinate unit of the tribe itself to provide for its economic development." Moreover, tribal leaders appoint MNE's board of directors; profits from MNE's commercial activities fund the tribe's governmental services; and in the court's view, extension of immunity to MNE would further the federal policy in favor of tribal autonomy. Likewise, "the Santee Sioux and SFS are also closely linked by virtue of SFS's method of creation, ownership, structure and control, and extension of immunity to it substantially promotes tribal autonomy." Thus, the Court of Appeal concluded, "[t]here can be little question that MNE and SFS, considered initially by themselves and without regard to the payday lending activities at issue in this enforcement action, function as arms of their respective tribes" and are entitled to immunity.

Turning to the online deferred deposit lenders named as defendants in the Commissioner's complaint, the Court of Appeal acknowledged that the analysis is "slightly more complicated." The court observed that "day-to-day operations of these fast-cash businesses . . . have been effectively delegated pursuant to management agreements." In addition, the tribal business entities "do not participate in the net income from the businesses, receiving instead only a modest

6

percentage of the gross revenues, characterized by the Commissioner as similar to a royalty."

Ultimately, however, the Court of Appeal found that the online lenders were entitled to tribal immunity: "A tribal entity engaged in a commercial enterprise that is otherwise entitled to be protected by tribal immunity does not lose that immunity simply by contracting with nontribal members to operate the business." As for the tribes' meager share of the lenders' revenues, the court concluded that "whether or not the Miami Tribe and the Santee Sioux negotiated good or poor management agreements for themselves . . . cannot serve as the basis to determine the tribal entities are not functioning as arms of their respective tribes."

We granted review.

## II.

The tribal entities' claim to immunity depends on the understanding that the Miami Tribe of Oklahoma and Santee Sioux Nation are themselves immune from suit. The high court first addressed the sovereign status of tribes in three opinions known today as the Marshall Trilogy after their author, Chief Justice John Marshall. (See *Worcester v. Georgia* (1832) 31 U.S. 515; *Cherokee Nation v. Georgia* (1831) 30 U.S. 1 (*Cherokee Nation*); *Johnson v. M'Intosh* (1823) 21 U.S. 543.) Broadly speaking, these cases established that "states lack jurisdiction in Indian country, that tribes are 'domestic dependent nations' to whom the United States owes a fiduciary obligation, and that Indian affairs are the exclusive province of the federal government." (Wood, *It Wasn't an Accident: The Tribal Sovereign Immunity Story* (2013) 62 Am.U. L.Rev. 1587, 1629, fns. omitted.)

Subsequent cases implied that tribes enjoy sovereign immunity from suit, but did so in dicta. (*Turner v. United States* (1919) 248 U.S. 354, 358 (*Turner*); *Parks v. Ross* (1851) 52 U.S. 362, 374.) Then, in *United States v. U.S. Fidelity &*

7

*Guaranty Co.* (1940) 309 U.S. 506 (*U.S. Fidelity*), the high court elevated the concept of tribal immunity "from dictum to holding." (*Agua Caliente Band of Cahuilla Indians v. Superior Court* (2007) 40 Cal.4th 239, 247 (*Agua Caliente*).) Citing *Turner*, *Cherokee Nation*, and decisions from the lower federal courts, the high court held that "Indian Nations are exempt from suit without Congressional authorization." (*U.S. Fidelity*, at p. 512; see *id.* at p. 512 & fns. 10–11.)

Since *U.S. Fidelity*, the high court has held that tribal immunity applies in a variety of contexts. (*Michigan v. Bay Mills Indian Community* (2014) 572 U.S. __, __–__ [134 S.Ct. 2024, 2038–2039] (*Bay Mills*) [immunity bars state's suit against tribe for opening casino outside tribal territory]; *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.* (1998) 523 U.S. 751, 754–758 (*Kiowa Tribe*) [tribes are immune from suit for breaches of contract involving off-reservation commercial conduct]; *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe* (1991) 498 U.S. 505, 510 (*Potawatomi*) [tribal immunity bars state's suit to enforce collection of sales tax on cigarettes]; *Three Affiliated Tribes v. Wold Engineering, P.C.* (1986) 476 U.S. 877, 891 (*Three Affiliated Tribes*) [federal law preempts requirement that tribe waive its sovereign immunity in all civil cases in order to sue in state court]; *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 51–52 (*Santa Clara Pueblo*) [Indian Civil Rights Act of 1968 did not abrogate tribal immunity, nor did it create an implied private right of action against tribal officials]; *Puyallup Tribe v. Department of Game* (1977) 433 U.S. 165, 171–172 (*Puyallup*) [state courts lack jurisdiction over tribe in suit to enforce state's fishing regulations].)

The rule that Indian tribes are immune from suit is now firmly established as a matter of federal law "and is not subject to diminution by the States." (*Kiowa Tribe*, *supra*, 523 U.S. at p. 756.) Tribal immunity applies in both federal and state court and extends to "suits arising from a tribe's commercial activities, even

when they take place off Indian lands." (*Bay Mills*, *supra*, 572 U.S. at p. __ [134 S.Ct. at p. 2031].)  Immunity can be abrogated by Congress, but congressional intent to abrogate tribal immunity must be " ' "unequivocally expressed." ' " (*Santa Clara Pueblo*, *supra*, 436 U.S. at p. 58.)  Immunity may also be waived, but "a tribe's waiver must be 'clear.' " (*C&L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma* (2001) 532 U.S. 411, 418.)  As discussed in more detail below, "tribal immunity applies not just broadly but deeply, frequently protecting not just tribal governments, but tribal entities and corporations that are considered subentities of the tribe." (Florey, *Indian Country's Borders: Territoriality, Immunity, and the Construction of Tribal Sovereignty* (2010) 51 B.C. L.Rev. 595, 627.)

Moreover, the high court has reiterated that tribal immunity "is a necessary corollary to Indian sovereignty *and* self-governance." (*Three Affiliated Tribes*, *supra*, 476 U.S. at p. 890, italics added.)  As that statement implies, the doctrine rests on two distinct rationales.  First, tribes are immune from suit by virtue of their sovereign status.  In *Bay Mills*, for instance, the high court observed that "[a]mong the core aspects of sovereignty that tribes possess . . . is the 'common-law immunity from suit traditionally enjoyed by sovereign powers.' " (*Bay Mills*, *supra*, 572 U.S. at p. __ [134 S.Ct. at p. 2027]; see *id.* at p. __ [*id.* at p. 2030] [citing Federalist No. 81 for the proposition that it is " 'inherent in the nature of sovereignty not to be amenable' to suit without consent"].)  Similarly, *U.S. Fidelity* referred to the immunity of tribes as "the immunity which was theirs as sovereigns." (*U.S. Fidelity*, *supra*, 309 U.S. at p. 512.)

Second, the high court has recognized policy rationales for tribal immunity that serve an ultimate interest in promoting tribal self-governance.  Permitting suits against tribes and, in some contexts, their officials would "impose serious financial burdens on already 'financially disadvantaged' tribes." (*Santa Clara*

9

*Pueblo*, *supra*, 436 U.S. at p. 64.) Conversely, immunity encourages tribal economic development and self-sufficiency by protecting tribal enterprises. (*Potawatomi*, *supra*, 498 U.S. at p. 510.) More broadly, exposing tribes to suit without their consent could work "a potentially severe impairment of the authority of the tribal government, its courts, and its laws," threatening the tribe's "ability to govern itself according to its own laws." (*Three Affiliated Tribes*, *supra*, 476 U.S. at p. 891; see *Kiowa Tribe*, *supra*, 523 U.S. at p. 758 [suggesting that immunity should be congruent with "what is needed to safeguard tribal self-governance"].) These rationales recognize that tribal immunity furthers the federal policy of tribal self-governance, an ideal that encompasses governmental, economic, and cultural autonomy. (See Cohen, Handbook of Federal Indian Law (2005 ed.) § 1.07, pp. 97–113 [describing shift in federal Indian policy from termination to self-governance].)

Finally, although the high court has rejected calls to abolish or curtail tribal immunity, the doctrine remains controversial as applied to certain tribal activities. In *Kiowa Tribe*, the high court acknowledged there are "reasons to doubt the wisdom" of extending tribal immunity to off-reservation commercial activity because doing so may go "beyond what is needed to safeguard tribal self-governance." (*Kiowa Tribe*, *supra*, 523 U.S. at p. 758.) But the high court ultimately "decline[d] to revisit [its] case law and ch[ose] to defer to Congress." (*Id.* at p. 760.) The three dissenting justices would have held that tribal immunity does not extend to off-reservation commercial activity. (See *id.* at p. 760 (dis. opn. of Stevens, J.).) In *Bay Mills*, four dissenting justices observed that "[i]n the 16 years since *Kiowa*, tribal commerce has proliferated and the inequities engendered by unwarranted tribal immunity have multiplied." (*Bay Mills*, *supra*, 572 U.S. at p. __ [134 S.Ct. at p. 2045] (dis. opn. of Thomas, J.); see *ibid.* (dis. opn. of Scalia, J.) [stating that although he concurred in *Kiowa Tribe*, "I am now

10

convinced that *Kiowa* was wrongly decided"].)  And the high court in *Bay Mills* hinted that it might be willing to consider in a future case "whether immunity should apply in the ordinary way if a tort victim, or other plaintiff who has not chosen to deal with a tribe, has no alternative way to obtain relief for off-reservation commercial conduct."  (*Id.* at p. __, fn.8 [134 S.Ct. at p. 2036, fn. 8].)

## III.

The main legal question in this case is how to determine whether a tribally affiliated entity shares in a tribe's immunity from suit.  We conclude that an entity asserting immunity bears the burden of showing by a preponderance of the evidence that it is an "arm of the tribe" entitled to tribal immunity.  In making that determination, courts should apply a five-factor test that considers (1) the entity's method of creation, (2) whether the tribe intended the entity to share in its immunity, (3) the entity's purpose, (4) the tribe's control over the entity, and (5) the financial relationship between the tribe and the entity.  As explained below, this test takes into account both formal and functional considerations — in other words, not only the legal or organizational relationship between the tribe and the entity, but also the practical operation of the entity in relation to the tribe.  Once the entity demonstrates that it is an arm of the tribe, it is immune from suit unless the opposing party can show that tribal immunity has been abrogated or waived.

## A.

The high court has recognized that tribal sovereign immunity extends to entities beyond the tribe itself.  (*Inyo County v. Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony* (2003) 538 U.S. 701, 705, fn. 1 ["The United States maintains, and the County does not dispute, that the Corporation is an 'arm' of the Tribe for sovereign immunity purposes."].)  But it has not articulated a framework for determining when a particular entity should be

11

considered an " 'arm' of the Tribe." (*Ibid.*) In the absence of guidance from the high court, state and federal courts have articulated a variety of arm-of-the-tribe tests.

Some jurisdictions have focused on a tribe's financial relationship to the disputed entity. Such an approach aims to protect the tribal treasury as a means of ensuring that the tribe retains its sovereign prerogative to govern itself through expenditure of funds and to allocate public resources through its own political processes. New York's high court, for instance, considers "financial relationship considerations" as "the most important" of several factors. (*Sue/Perior Concrete & Paving, Inc. v. Lewiston Golf Course Corp.* (N.Y. 2014) 25 N.E.3d 928, 935 (*Sue/Perior*).) The financial relationship factor includes "whether the corporate entity generates its own revenue, whether a suit against the corporation will impact the tribe's fiscal resources, and whether the subentity has the 'power to bind or obligate the funds of the [tribe]' [citation]. The vulnerability of the tribe's coffers in defending a suit against the subentity indicates that the real party in interest is the tribe." (*Ransom v. St. Regis Mohawk Education and Community Fund, Inc.* (N.Y. 1995) 658 N.E.2d 989, 992–993.) Under New York's test, "[i]f a judgment against a corporation created by an Indian tribe will not reach the tribe's assets, because the corporation lacks 'the power to bind or obligate the funds of the tribe' [citation], then the corporation is not an 'arm' of the tribe." (*Sue/Perior*, at p. 935; see *Dixon v. Picopa Construction Co.* (Ariz. 1989) 772 P.2d 1104, 1109–1110 [tribally affiliated business was not entitled to immunity in part because its insurance coverage and limited liability clause shielded tribe from direct liability].)

Alaska's test likewise considers the financial relationship between the tribe and the entity to be "of paramount importance." (*Runyon ex rel. B.R. v. Association of Village Council Presidents* (Alaska 2004) 84 P.3d 437, 440

12

(*Runyon*).) Indeed, it appears to make tribal liability for the entity's acts a threshold requirement for immunity. Under *Runyon*, "if a judgment against [the entity] will not reach the tribe's assets or if [the entity] lacks the 'power to bind or obligate the funds of the [tribe],' it is unlikely that the tribe is the real party in interest," and the entity therefore cannot share in the tribe's immunity. (*Ibid*.) Only if the tribe is "legally responsible for the entity's obligations" do additional factors such as control and purpose come into play. (*Id.* at p. 441.)

Other states have adopted tests that omit or deemphasize the financial relationship and instead focus on the legal or organizational relationship between the tribe and the entity. Compared to the New York and Alaska approaches, these tests tend to favor immunity. Colorado and Washington apply tests that do not require a showing that the tribe would be liable for a judgment against the entity. (*Cash Advance and Preferred Cash Loans v. State* (Colo. 2010) 242 P.3d 1099, 1110 (*Cash Advance*) [immunity turns on "(1) whether the tribes created the entities pursuant to tribal law; (2) whether the tribes own and operate the entities; and (3) whether the entities' immunity protects the tribes' sovereignty"]; *Wright v. Colville Tribal Enterprise Corp.* (Wash. 2006) 147 P.3d 1275, 1279 (*Wright*) [suggesting, without extensive discussion, that the only relevant factors are whether the tribal entity is "owned and controlled by a tribe, and created under its own tribal laws"].)

Minnesota's approach focuses on three "principal factors . . . in determining whether tribal sovereign immunity extends to a tribal business entity . . . [¶] 1) whether the business entity is organized for a purpose that is governmental in nature, rather than commercial; [¶] 2) whether the tribe and the business entity are closely linked in governing structure and other characteristics; and [¶] 3) whether federal policies intended to promote Indian tribal autonomy are furthered by the

13

extension of immunity to the business entity." (*Gavle v. Little Six, Inc.* (Minn. 1996) 555 N.W.2d 284, 294 (*Gavle*).)

Among the federal decisions that have addressed this issue, the Tenth Circuit's opinion in *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino and Resort* (10th Cir. 2010) 629 F.3d 1173 (*Breakthrough*) appears most influential. *Breakthrough* adopted a six-factor test that includes "(1) the method of the [entities'] creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the Tribe has over the entities; (4) whether the Tribe intended for them to have tribal sovereign immunity; (5) the financial relationship between the Tribe and the [entities]; and (6) whether the purposes of tribal sovereign immunity are served by granting them immunity." (*Id.* at p. 1191.) Although *Breakthrough* "recognize[d] that the financial relationship between a tribe and its economic entities is a relevant measure of the closeness of their relationship," it rejected the notion that financial relationship or any other single factor is "a dispositive inquiry." (*Id.* at p. 1187.)

The Ninth Circuit recently adopted the *Breakthrough* approach (*White v. University of California* (9th Cir. 2014) 765 F.3d 1010, 1025 (*White*)), and *Breakthrough* is consistent with previous federal decisions that addressed the issue without articulating an express multifactor test (see, e.g., *Cook v. Avi Casino Enterprises* (9th Cir. 2008) 548 F.3d 718, 726 [tribal entity entitled to immunity where "the Tribe created [it] pursuant to a tribal ordinance and intergovernmental agreement," "the tribal corporation is wholly owned and managed by the Tribe," "the economic benefits produced by the casino inure to the Tribe's benefit," and a majority of the entity's board must be members of the tribe]).

14

**B.**

Like the high court, we have recognized that tribal immunity " 'extends to entities that are arms of the tribes,' " but we have not elaborated on the appropriate test for determining when an entity merits this designation. (*Agua Caliente*, *supra*, 40 Cal.4th at p. 247, quoting Cohen, Handbook of Federal Indian Law, *supra*, § 7.05[1][a], p. 636.) In grappling with this issue, the Courts of Appeal have followed the lead of other jurisdictions.

In *Trudgeon v. Fantasy Springs Casino* (1999) 71 Cal.App.4th 632 (*Trudgeon*), a man injured in a fight at a tribal bingo hall sued the tribal corporation that operated the venue. The Court of Appeal largely adopted *Gavle*'s analysis, calling it "an accurate summation of the relevant case law." (*Trudgeon*, at p. 639.) Applying *Gavle*'s three factors, the Court of Appeal concluded that the tribal corporation was immune because its underlying purpose of promoting tribal development "is governmental in nature notwithstanding its for-profit status," the tribe "directly oversees the operations" of the corporation, and both Congress and the high court have recognized that Indian gaming furthers tribal self-determination. (*Trudgeon*, at pp. 639–643.)

*Redding Rancheria v. Superior Court* (2001) 88 Cal.App.4th 384 (*Redding Rancheria*) also involved a tort victim who was injured on the premises of a tribal gaming facility. The court cited *Trudgeon*'s approach with approval and concluded that tribal immunity barred the plaintiff's suit because he "presented no evidence in the trial court to challenge the Tribe's evidence the casino was an arm of the Tribe." (*Redding Rancheria*, at p. 389, italics omitted.)

In *American Property Management Corp. v. Superior Court* (2012) 206 Cal.App.4th 491 (*American Property Management*), a California limited liability company called U.S. Grant, which was indirectly affiliated with the Sycuan Band of the Kumeyaay Nation, purchased a hotel. (*Id.* at p. 495–496.) The tribe created

15

the Sycuan Tribal Development Corporation under tribal law and then established "several layers of California limited liability companies to stand between it and [U.S. Grant,] the entity that took ownership of the hotel." (*Id.* at p. 495.) The issue was whether U.S. Grant was entitled to tribal immunity in a contract dispute. The Court of Appeal "agree[d] that the list of factors set forth by the Tenth Circuit [in *Breakthrough*] is helpful and, although the factors overlap somewhat when applied, they accurately reflect the general focus of the applicable federal and state case law." (*American Property Management*, at p. 501.) The court analyzed each of these factors and, in support of its finding of no immunity, explained that "the dispositive fact throughout our analysis is that U.S. Grant, LLC is a California limited liability company" rather than an entity organized under tribal law. (*Ibid.*) Justice Aaron agreed that U.S. Grant was not immune as an arm of the tribe but disagreed with the court's "dispositive" emphasis on the company's formation under state law. (*Id.* at p. 513 (conc. opn. of Aaron, J.).) She would have weighed the various *Breakthrough* factors differently in arriving at the same conclusion. (*Id.* at pp. 513–514.)

The Court of Appeal in this case initially remanded the matter to the trial court to analyze MNE's and SFS's claim of immunity under the factors identified in *Trudgeon* and *Redding Rancheria*. (See *Ameriloan v. Superior Court* (2008) 169 Cal.App.4th 81, 98.) In the opinion below, the Court of Appeal applied "elements of the various tests appearing in the case law," including the entity's ownership, governance, and financial relationship to the tribe, but concluded that "the tribe's method and purpose for creating a subordinate economic entity are the most significant factors in determining whether it is protected by a tribe's sovereign immunity and should be given predominant, if not necessarily dispositive, consideration."

16

## C.

Noting a lack of consensus across jurisdictions regarding the arm-of-the-tribe test, the Commissioner urges us to seek guidance from the arm-of-the-state doctrine. She argues that because tribal and state sovereign immunity are "fundamentally similar," we should "look to the analogous and better-developed doctrine governing arm-of-the-state immunity." Although we decline the Commissioner's invitation to look to the arm-of-the-state doctrine for guidance on the *factors* of the arm-of-the-tribe test, we agree with her view that a tribally affiliated entity, just like a state-affiliated entity, bears the burden of proving it is entitled to immunity.

As the Commissioner acknowledges, tribal sovereignty "differs from state sovereignty in important respects." Unlike the states, which have consented to suit by other states (*Alden v. Maine* (1999) 527 U.S. 706, 755), tribes have never agreed to so limit their sovereign immunity. The high court has "repeatedly held that Indian tribes enjoy immunity against suits by States, [citation], as it would be absurd to suggest that the tribes surrendered immunity in a [constitutional] convention to which they were not even parties." (*Blatchford v. Native Village of Noatak* (1991) 501 U.S. 775, 782; see *Idaho v. Coeur d'Alene Tribe of Idaho* (1997) 521 U.S. 261, 268–269 ["[T]he plan of the Convention did not surrender Indian tribes' immunity for the benefit of the States."].)

At the same time, tribes are " ' "domestic dependent nations" ' . . . subject to plenary control by Congress," which means Congress enjoys free rein to abrogate tribal immunity so long as its intent is clearly expressed. (*Bay Mills*, *supra*, 572 U.S. at p. __ [134 S.Ct. at p. 2030].) Indeed, the high court has emphasized deference to Congress's broad authority as a reason why courts should be wary of restricting tribal immunity. (See *id.* at p. __ [134 S.Ct. at pp. 2038–2039]; *Kiowa Tribe*, *supra*, 523 U.S. at pp. 758–759.) By contrast, Congress may

17

abrogate state sovereign immunity only when its intent is clearly stated *and* it acts "pursuant to a constitutional provision granting Congress the power to abrogate." (*Seminole Tribe of Florida v. Florida* (1996) 517 U.S. 44, 59.) Even when Congress seeks to authorize suit against the states pursuant to its power to enforce the Fourteenth Amendment, there "must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." (*City of Boerne v. Flores* (1997) 521 U.S. 507, 520.)

Beyond these conceptual differences, it is not clear which version of the arm-of-the-state test we would adopt even if we were inclined to look to that doctrine for guidance. "The jurisprudence over how to apply the arm-of-the-state doctrine is, at best, confused." (*Mancuso v. New York State Thruway Authority* (2d Cir. 1996) 86 F.3d 289, 293.) It has produced "four Supreme Court sample case analyses, none of which purport to offer a systematic arm-of-the-state test or a formalized list of factors; two competing Eleventh Amendment rationales intended to guide the factor analysis; twelve very different circuit court tests, each with their own twists, measuring a litany of factors that vary by circuit; and scores of lower court precedents . . . with outcomes varying not only circuit by circuit but state by state within a given circuit." (Comment, *Keeping the Arms in Touch: Taking Political Accountability Seriously in the Eleventh Amendment Arm-of-the-State Doctrine* (2015) 64 Emory L.J. 819, 829–830.)

Furthermore, although courts have taken different approaches to fashioning an arm-of-the-tribe test, we believe the doctrine is sufficiently well developed to guide our analysis. Numerous courts, including our own Courts of Appeal, have addressed this issue in the context of typical business activities in which tribally affiliated entities engage. (See, e.g., *Redding Rancheria*, *supra*, 88 Cal.App.4th 384 [tribal casino]; *Cash Advance*, *supra*, 242 P.3d at p. 1103 [same deferred deposit lending operations at issue in this case].) These opinions, combined with

18

the high court's tribal immunity precedent, provide a sufficient basis for formulating our own version of the test.

Nonetheless, we agree with the Commissioner that the burden of proof on the issue of immunity properly falls on the entity claiming immunity. Typically, on a "motion asserting sovereign immunity as a basis for dismissing an action . . . the plaintiff bears the burden of proving by a preponderance of evidence that jurisdiction exists." (*Campo Band of Mission Indians v. Superior Court* (2006) 137 Cal.App.4th 175, 183 (*Campo Band*).) When a tribe asserts sovereign immunity, the plaintiff must show that the tribe's immunity has been abrogated or waived; if not, the court lacks jurisdiction. (*Ibid*.) The Commissioner argues this rule should not apply to a tribally affiliated entity until it proves it is an arm of the tribe. Only then, she contends, should the burden shift to the plaintiff to prove the existence of jurisdiction.

In support of this argument, the Commissioner relies on *ITSI T.V. Productions, Inc. v. Agricultural Assns.* (9th Cir. 1993) 3 F.3d 1289 (*ITSI*), which held that "Eleventh Amendment immunity, whatever its jurisdictional attributes, should be treated as an affirmative defense" and thus "must be proved by the party that asserts it and would benefit from its acceptance." (*Id.* at p. 1291.) Accordingly, when a state-affiliated entity seeks immunity on the basis of state sovereign immunity, it must first show it is an arm of the state. (*Id.* at p. 1292; see *Woods v. Rondout Valley Central School District Bd. of Education* (2d Cir. 2006) 466 F.3d 232, 237 (*Woods*) [following *ITSI* and decisions from other federal circuit courts "in holding that the governmental entity invoking the Eleventh Amendment bears the burden of demonstrating that it qualifies as an arm of the state entitled to share in its immunity"].) According to the Commissioner, the same rule should apply to an entity claiming to be an arm of a tribe.

Few arm-of-the-tribe cases have closely considered which party bears the burden of proof. *American Property Management* placed the burden on the plaintiff to show that the entity was not an arm of the tribe, as did the opinion below. Yet these opinions simply assumed, without analysis, that tribally affiliated entities should be treated the same as tribes themselves. (See *American Property Management*, *supra*, 206 Cal.App.4th at p. 498.) Arm-of-the-tribe cases, however, require the court to decide an antecedent question: "whether [the entities] can claim sovereign immunity in the first instance." (*City of New York v. Golden Feather Smoke Shop, Inc.* (E.D.N.Y. Mar. 16, 2009, No. 08–CV–3966 (CBA)) 2009 WL 705815, p. *3 (*Golden Feather*).)

Among the cases that have analyzed this issue in greater depth, the results are mixed. In *Cash Advance*, the Colorado Supreme Court acknowledged that the jurisdictional nature of tribal immunity is not entirely clear but concluded "that tribal sovereign immunity bears a substantial enough likeness to subject matter jurisdiction to be treated as such for procedural purposes." (*Cash Advance*, *supra*, 242 P.3d at p. 1113.) Hence, under Colorado's rule, the plaintiff has the "burden of proving that the tribal entities are not entitled to immunity by a preponderance of the evidence." (*Ibid.*) By contrast, the court in *Gristede's Foods, Inc. v. Unkechuage Nation* (E.D.N.Y. 2009) 660 F.Supp.2d 442 held that the entity seeking immunity "must establish, by a preponderance of evidence, that it is an arm of the [tribe], and thus entitled to immunity." (*Id.* at p. 465; see *Golden Feather*, *supra*, 2009 WL 705815, at pp. *3–4 [citing *ITSI* and *Woods* in support of same conclusion]; *Cash Advance*, *supra*, 242 P.3d at p. 1120 (dis. opn. of Coats, J.).)

Having considered *ITSI*, *Woods*, and similar cases from other federal courts, we find their rationales for placing the initial burden of proof on state-affiliated entities persuasive with regard to tribally affiliated entities. As with state

20

sovereign immunity, the jurisdictional nature of tribal immunity has never been definitively settled. The high court's cases indicate that tribal immunity is jurisdictional in a general sense, but they have not elaborated further. (See *Puyallup*, *supra*, 433 U.S. at p. 172 [absent abrogation or waiver, "a state court may not exercise jurisdiction over a recognized Indian tribe"]; *Bay Mills*, *supra*, 572 U.S. at p. __, fn. 2 [134 S.Ct. at p. 2029, fn. 2] [although tribe was immune from suit, court had subject matter jurisdiction pursuant to the Indian Gaming Regulatory Act].) California Court of Appeal cases often describe tribal immunity as a challenge to subject matter jurisdiction, but this court's most recent tribal immunity case discussed it in terms of personal jurisdiction. (Compare, e.g., *Campo Band*, *supra*, 137 Cal.App.4th at p. 182, with *Agua Caliente*, *supra*, 40 Cal.4th at p. 244; see *Great Western Casinos, Inc. v. Morongo Band of Mission Indians* (1999) 74 Cal.App.4th 1407, 1416 [noting "inconsistency in the law regarding whether claims of sovereign immunity affect a court's personal as opposed to subject matter jurisdiction"].) The federal circuit courts are split on this question. (Compare *Miner Electric, Inc. v. Muscogee (Creek) Nation* (10th Cir. 2007) 505 F.3d 1007, 1009 ["Tribal sovereign immunity is a matter of subject matter jurisdiction"] with *In re Prairie Island Dakota Sioux* (8th Cir. 1994) 21 F.3d 302, 305 [tribal "sovereign immunity is a jurisdictional consideration separate from subject matter jurisdiction"].)

Regardless of how we characterize tribal immunity, it is undisputed that tribal immunity, like state sovereign immunity, can be affirmatively waived. In addition, trial courts do not have a sua sponte duty to raise the issue of tribal immunity. These features indicate that tribal immunity, like Eleventh Amendment immunity, is not "a true jurisdictional bar" that automatically divests a court of the ability to hear or decide the case. (*ITSI*, *supra*, 3 F.3d at p. 1291; see *Wisconsin Dept. of Corrections v. Schacht* (1998) 524 U.S. 381, 389.) Thus, "whatever its

21

jurisdictional attributes," tribal immunity "does not implicate a . . . court's subject matter jurisdiction in any ordinary sense." (*ITSI*, at p. 1291.)

In the arm-of-the-tribe context, as for arms of the state, placing the burden on the entity asserting immunity "comports with the traditional principle that a party in possession of facts tending to support its claim should be required to come forward with that information." (*Woods*, *supra*, 466 F.3d at p. 238; see *U.S. v. New York, New Haven & Hartford Railroad Co.* (1957) 355 U.S. 253, 256, fn. 5.) The arm-of-the-tribe inquiry "will occasion serious dispute only where a relatively complex institutional arrangement makes it unclear whether a given entity ought to be treated as an arm of the [tribe]. In such cases, the 'true facts' as to the particulars of this arrangement will presumably 'lie peculiarly within the knowledge of' the party claiming immunity." (*ITSI*, *supra*, 3 F.3d at p. 1292.)

Placing the burden of proof on the entity also aligns with our basic notions of why arms of the tribe are immune from suit. An entity that is formally distinct from the tribe will be immune from suit only insofar as it benefits from the tribe's own immunity. Once the entity has established that it is an arm of the tribe, we treat the lawsuit as if it were an action against the tribe itself. As noted, tribal immunity is a strong tonic; such immunity shields a tribe from liability unless "Congress has so authorized or . . . the Tribe has waived its immunity by consenting to suit," and the burden of proving abrogation or waiver falls on the plaintiff. (*Lawrence v. Barona Valley Ranch Resort and Casino* (2007) 153 Cal.App.4th 1364, 1368.) But until the entity has proven it should be treated as an extension of the tribe, it is no more entitled to a presumption of immunity than any other party. Accordingly, we conclude that a tribally affiliated entity claiming immunity bears the burden of proving by a preponderance of the evidence that it is an arm of the tribe.

## D.

We now turn to the substance of the arm-of-the-tribe test. Having reviewed prior California decisions as well as the various approaches in other jurisdictions, we adopt a modified version of the Tenth Circuit's *Breakthrough* test. That test's factors — method of creation, tribal intent, purpose, control, and financial relationship — properly account for the understanding that tribal immunity is both "an inherent part of the concept of sovereignty" and " 'necessary to promote the federal policies of tribal self[-]determination, economic development, and cultural autonomy.' " (*Breakthrough*, *supra*, 629 F.3d. at p. 1182.)

Since immunity is inherent in the nature of tribal sovereignty (*Bay Mills*, *supra*, 572 U.S. at p. __ [134 S.Ct. at p. 2030]), it is appropriate that the arm-of-the-tribe test considers the legal relationship and organizational proximity between the tribe and the entity. The entity's method of formation and declared purpose, whether the tribe intended the entity to share in its immunity, and the financial linkage and formal control that the tribe possesses in relation to the entity are factors that illuminate whether the dignity that immunity doctrine accords to the tribe by virtue of its sovereign status should extend to the entity by virtue of its status as a tribal affiliate. The more closely linked the entity is to the tribe in these formal dimensions, the more likely it is to share in the tribe's inherent immunity.

At the same time, tribal immunity is intended to promote the federal policy of tribal self-governance, which includes economic self-sufficiency, cultural autonomy, and the tribe's "ability to govern itself according to its own laws." (*Three Affiliated Tribes*, *supra*, 476 U.S. at p. 891; see *Potawatomi*, *supra*, 498 U.S. at p. 510.) The same five factors — method of creation, tribal intent, purpose, control, and financial relationship — incorporate the understanding that tribal immunity should extend to arms of the tribe when such immunity would, as a practical matter, further that federal policy. Most notably, the purpose factor

23

considers the extent to which the entity actually promotes tribal self-governance; the control factor examines the degree to which the tribe actually, not just nominally, directs the entity's activities; and the financial relationship factor considers the degree to which the entity's liability could impact the tribe's revenue. These functional considerations illuminate the degree to which imposition of liability on the entity would practically impair tribal self-governance.

In addition to the five factors just discussed, *Breakthrough* articulated a sixth: "whether the purposes of tribal sovereign immunity are served by granting [the entity] immunity." (*Breakthrough*, *supra*, 629 F.3d at p. 1181.) That factor, which "overlaps significantly with [the] other factors" (*American Property Management*, *supra*, 206 Cal.App.4th at p. 507), serves to focus the analysis of the individual factors on the purposes of tribal sovereign immunity; it need not be considered separately here. Accordingly, in assessing whether an entity is an arm of the tribe, courts should analyze the following factors:

*Method of creation.* In considering "the method of creation of the economic entit[y]" (*Breakthrough*, *supra*, 629 F.3d. at p. 1187), courts have focused on the law under which the entity was formed. Formation under tribal law weighs in favor of immunity (*id.* at p. 1191), whereas formation under state law has been held to weigh against immunity (*American Property Management*, *supra*, 206 Cal.App.4th at p. 503) or to constitute a waiver of immunity (*Wright*, *supra*, 147 P.3d at p. 1280; *Runyon*, *supra*, 84 P.3d at p. 441). The circumstances under which the entity's formation occurred, including whether the tribe initiated or simply absorbed an operational commercial enterprise, are also relevant.

*Tribal intent.* In some cases, the tribal ordinance or articles of incorporation creating the entity will express whether the tribe intended the entity to share in its immunity. (See *Breakthrough*, *supra*, 629 F.3d at p. 1193.)

24

Because the entity bears the burden of proof and is typically positioned to specify the terms of its creation or incorporation in collaboration with the tribe, this factor will generally weigh against immunity if the record is silent as to the tribe's intent. In certain cases, it may be possible to infer the tribe's intent, even where it is not express, from the tribe's actions or other sources.

*Purpose.* This factor encompasses both the stated purpose for which the entity was created and the degree to which the entity actually serves that purpose. In adopting this factor, we disagree with the Colorado Supreme Court's view that high court precedent "render[s] the entity's purpose and its activities irrelevant to the determination whether it qualifies for immunity." (*Cash Advance*, *supra*, 242 P.3d at p. 1111.) Although the high court has rejected the argument that a *tribe's* immunity turns on whether the activities in question are governmental or commercial, it has not addressed whether purpose is relevant in analyzing immunity for tribally affiliated entities. Judicial inquiry into the entity's purpose may elucidate whether its relationship to the tribe is sufficiently close, and its activities sufficiently germane to tribal self-governance, that it shares in the tribe's immunity.

The inquiry into this factor begins with the entity's stated purpose. In order to weigh in favor of immunity, the stated purpose need not be purely governmental so long as it relates to broader goals of tribal self-governance. If the entity was created to develop the tribe's economy, fund its governmental services, or promote cultural autonomy, its purpose pertains to tribal self-governance notwithstanding the entity's commercial activities. (See *Breakthrough*, *supra*, 629 F.3d at p. 1192 [tribal gaming authority and casino "were created for the financial benefit of the Tribe and to enable it to engage in various governmental functions"]; *Gavle*, *supra*, 555 N.W.2d at p. 295 [discussing "the unique role that Indian gaming serves in the economic life of here-to-fore impoverished Indian communities

25

across this country"]; *American Property Management*, *supra*, 206 Cal.App.4th at pp. 509–510 (conc. opn. of Aaron, J.) [discussing symbolic importance for tribe of entity's purchase of historic hotel].) By contrast, this factor will weigh against immunity if the entity was created " 'solely for business purposes and without any declared objective of promoting the [tribe's] general tribal or economic development.' " (*Trudgeon*, *supra*, 71 Cal.App.4th at p. 640.)

If the entity's stated purpose is sufficiently related to tribal self-governance, the inquiry then examines the extent to which the entity actually serves that purpose. The fit between stated purpose and practical execution need not be exact, but the closer the fit, the more it will weigh in favor of immunity. An entity whose declared purpose is to further the tribe's economic development may bolster its case for immunity by proving, for example, the number of jobs it creates for tribal members or the amount of revenue it generates for the tribe. By contrast, evidence that the entity engages in activities unrelated to its stated goals or that the entity actually operates to enrich primarily persons outside of the tribe or only a handful of tribal leaders weighs against finding that the entity is an arm of the tribe. Courts should consider such evidence in order to meaningfully evaluate an entity's stated purpose.

*Control.* This factor concerns the entity's "structure, ownership, and management, including the amount of control the Tribe has over the entities." (*Breakthrough*, *supra*, 629 F.3d at p. 1191.) Relevant considerations include the entity's formal governance structure, the extent to which it is owned by the tribe, and the entity's day-to-day management. An entity's decision to outsource management to a nontribal third party is not enough, standing alone, to tilt this factor against immunity. As the Minnesota Supreme Court has observed, "control of a corporation need not mean control of business minutiae; the tribe can be enmeshed in the direction and control of the business without being involved in

26

the actual management." (*Gavle*, *supra*, 555 N.W.2d at p. 295; see *Trudgeon*, *supra*, 71 Cal.App.4th at p. 641.) If the tribe retains some ownership and formal control over the entity but has contracted out its management, this factor may weigh either for or against immunity depending on the particular facts of the case. Evidence that the tribe actively directs or oversees the operation of the entity weighs in favor of immunity; evidence that the tribe is a passive owner, neglects its governance roles, or otherwise exercises little or no control or oversight weighs against immunity. (See *American Property Management*, *supra*, 206 Cal.App.4th at p. 505 [indicating that "indirect ownership and control of the tribal corporation" weighs against a finding of immunity].)

*Financial relationship.* The starting point for analyzing the financial relationship between the entity and the tribe is whether a judgment against the entity would reach the tribe's assets. (See *American Property Management*, *supra*, 206 Cal.App.4th at p. 506.) But direct tribal liability for the entity's actions is neither a threshold requirement for immunity nor a predominant factor in the overall analysis, and we disagree with those courts that have held as much. (See *Sue/Perior*, *supra*, 25 N.E.3d at p. 935; *Runyon*, *supra*, 84 P.3d at pp. 440–441.) As the Commissioner acknowledges, "raising revenues through taxation is harder for tribes than for states." "[F]ew tribes have any significant tax base. Tribal business enterprises may be the only means by which a tribe can raise revenues — and thus such enterprises may be essential to the fulfillment of the tribe's governmental obligations." (Struve, *Tribal Immunity and Tribal Courts* (2004) 36 Ariz.St. L.J. 137, 169; see *Bay Mills*, *supra*, 572 U.S. at p. __ [134 S.Ct. at p. 2043] (conc. opn. of Sotomayor, J.) [due to a lack of other revenue sources, "tribal business operations are critical to the goals of tribal self-sufficiency"].) Some tribes rely on such business revenues to an extent that a judgment against

the entity could effectively strike a blow against the tribal treasury, regardless of whether the tribe is directly liable.

Thus, courts consider the extent to which the tribe "depends . . . on the [entity] for revenue to fund its governmental functions, its support of tribal members, and its search for other economic development opportunities." (*Breakthrough*, *supra*, 629 F.3d at p. 1195.)  If a significant percentage of the entity's revenue flows to the tribe, or if a judgment against the entity would significantly affect the tribal treasury, this factor will weigh in favor of immunity even if the entity's liability is formally limited.  (See *ibid.*; *Wright*, *supra*, 147 P.3d at p. 1284 (conc. opn. of Madsen, J.) [although tribe was not directly liable for entities' obligations, "[a]ny liability imposed on the corporations could still affect the tribe's finances"].)  Determining whether this factor weighs in favor of immunity requires a consideration of degree rather than a binary decision.  But because any imposition of liability on a tribally affiliated entity could theoretically impact tribal finances, the entity must do more than simply assert that it generates some revenue for the tribe in order to tilt this factor in favor of immunity.

In setting forth the five factors of the arm-of-the-tribe test, we emphasize that no single factor is universally dispositive.  (See, e.g., *Breakthrough*, *supra*, 629 F.3d at p. 1187 [financial relationship "is *not* a dispositive inquiry"]; *American Property Management*, *supra*, 206 Cal.App.4th at p. 509 (conc. opn. of Aaron, J.) [method of creation is not dispositive].)  Each case will call for fact-specific inquiry into all the factors followed by an overall assessment of whether the entity has carried its burden by a preponderance of the evidence.

Although the Court of Appeal in this case examined the factors discussed above, it "believe[d] the tribe's method and purpose for creating a subordinate economic entity are the most significant factors in determining whether it is protected by a tribe's sovereign immunity and should be given predominant, if not

28

necessarily dispositive, consideration."  The court observed that although the tribes had delegated day-to-day operations of the online lending businesses to a nontribal third party, "under the management agreements MNE and SFS have final decisionmaking authority to approve or disapprove any loans; advance instructions or approval parameters are established by them to allow the third-party managers to function on a quick-turnaround basis.  Indeed, the agreements expressly provide that the tribal entities have 'the sole proprietary interest in and responsibility for the conduct of the business' and that [the third party's] day-to-day management of the operations is 'subject to the oversight and control of' MNE and SFS, respectively."

In light of these considerations, the court held, it did not matter "whether or not the Miami Tribe and the Santee Sioux negotiated good or poor management agreements for themselves" or "whether they could have insisted on a higher percentage than they actually received."  The court concluded:  "Absent an extraordinary set of circumstances not present here, a tribal entity functions as an arm of the tribe if it has been formed by tribal resolution and according to tribal law, for the stated purpose of tribal economic development and with the clearly expressed intent by the sovereign tribe to convey its immunity to that entity, and has a governing structure both appointed by and ultimately overseen by the tribe.  Such a tribal entity is immune from suit absent express waiver or congressional authorization.  Neither third-party management of day-to-day operations nor retention of only a minimal percentage of the profits from the enterprise (however that may be defined) justifies judicial negation of that inherent element of tribal sovereignty."

The Court of Appeal thus assigned dispositive weight to formal considerations:  the formation of the entities under tribal law, the tribes' intent to confer immunity, and the governance structure as set forth in the language of the

management agreements. In so doing, the Court of Appeal tilted its analysis toward one of "the two poles of the arm-of-the-tribe debate as it relates to tribally-affiliated lenders. Tribes will likely maintain that whether an entity functions as an arm of the tribe is a foundational inquiry, and not to be inferred from the functional arrangements, whatever they are. If tribal sovereignty is inherent and not subject to diminution by the states, so the argument goes, a state court lacks the power to hold that a tribal entity formed according to tribal law, by tribal resolution, for the stated purposes of tribal development, with clear intent on the part of the sovereign tribe to convey its sovereign immunity to the entity, is not an arm of the tribe, simply because the deal the tribe negotiated does not retain enough of the profits to satisfy the court. On the other hand, it is common sense that if an entity provides a miniscule percentage of its revenue to the tribe, and the tribe is barely involved, the entity cannot be said to stand in the place of the tribe. Moreover, if a tribe retains only a minimal percentage of the profits from the enterprise, it would appear that the enterprise may not be truly 'controlled' by the tribe." (Martin & Schwartz, *supra*, 69 Wash. & Lee L.Rev. at p. 784.)

While recognizing the relevance of the formal relationship between a tribe and the disputed entity, we conclude that the Court of Appeal gave inordinate weight to those formal considerations in the overall balance when it said they could be outweighed only by "an extraordinary set of circumstances." As explained further below, organizational arrangements on paper do not necessarily illuminate how businesses operate in practice. Here, the language of the management agreements between the tribes and the online lenders is not, by itself, sufficient to warrant the Court of Appeal's conclusion that "MNE and SFS are not merely passive bystanders to the challenged lending activities." Given the manipulability of formal arrangements, it is important to carefully examine how such arrangements function as a practical matter, lest we expand the application of

30

tribal immunity beyond its established rationales and indeed beyond "common sense." (Martin & Schwartz, *supra*, 69 Wash. & Lee L.Rev. at p. 784.)

Business entities that claim arm-of-the-tribe immunity "have no inherent immunity of their own. Instead, they enjoy immunity only to the extent the immunity of the tribe, which does have inherent immunity, is extended to them. In view of that fact, it is possible to imagine situations in which a tribal entity may engage in activities which are so far removed from tribal interests that it no longer can legitimately be seen as an extension of the tribe itself." (*Trudgeon*, *supra*, 71 Cal.App.4th at p. 639.) In such cases, extending immunity to the entity would not " 'promote the federal policies of tribal self[-]determination, economic development, and cultural autonomy.' " (*Breakthrough*, *supra*, 629 F.3d. at p. 1182.) Arm-of the-tribe immunity must not become a doctrine of form over substance. The ultimate purpose of the inquiry is to determine "whether the entity *acts* as an arm of the tribe so that its *activities* are properly deemed to be those of the tribe." (*Allen v. Gold Country Casino* (9th Cir. 2006) 464 F.3d 1044, 1046, italics added (*Allen*); see *id.* at p. 1047 [extending tribal immunity to casino because "there can be little doubt that the Casino *functions* as an arm of the Tribe" (italics added)].)

## IV.

Whether tribal immunity bars suit is a question of law that we review de novo. (See *Findleton v. Coyote Valley Band of Pomo Indians* (2016) 1 Cal.App.5th 1194, 1197.) Applying the inquiry set forth above, we hold that on the record before us, the lenders named as defendants in the Commissioner's complaint are not entitled to immunity as arms of the Miami Tribe of Oklahoma and Santee Sioux Nation, respectively.

At the outset, we note that our analysis focuses on these lenders as part of SFS and MNE Services rather than as separate entities. Preferred Cash and One

31

Click Cash are simply trade names under which SFS conducts its lending business. When the Commissioner filed the complaint, Ameriloan, United Cash Loans, and U.S. Fast Cash were trade names under which MNE (through its TFS subdivision) conducted lending operations. But by the time the trial court granted the motion to quash, MNE had transferred ownership of that lending business, including the trade names, to MNE Services. We thus agree with the Commissioner that for purposes of determining the immunity of Ameriloan, United Cash Loans, and U.S. Fast Cash, our focus must be on MNE Services, although evidence regarding MNE's prior operations under those trade names may shed light on the inquiry.

Although the Commissioner, joined by various amici curiae, decries the impact of short-term deferred deposit lending on vulnerable borrowers, the Court of Appeal was correct that "tribal immunity does not depend on our evaluation of the respectability or ethics of the business in which a tribe or tribal entity elects to engage." In every instance where some form of immunity bars suit, an alleged wrong will go without a remedy. (See *Puyallup*, *supra*, 433 U.S. at p. 168 [no remedy for alleged overfishing by tribe]; *Potawatomi*, *supra*, 498 U.S. at p. 507 [no remedy for tribe's refusal to collect state sales tax]; *Santa Clara Pueblo*, *supra*, 436 U.S. at pp. 51–52 [no remedy for gender discrimination in tribal membership requirements].) Our immunity analysis does not rest on the merits or ethics of deferred lending as a means of tribal economic development. Instead, our inquiry focuses on whether SFS and MNE Services have shown on this record that they have a sufficiently close relationship with their respective tribes to warrant the protection of sovereign immunity.

The record reveals a nominally close relationship between SFS and the Santee Sioux, and between MNE Services and the Miami Tribe. But it contains scant evidence that either tribe actually controls, oversees, or significantly benefits from the underlying business operations of the online lenders. On the record

32

before us, which both parties contend is undisputed, we are unable to conclude that defendants have carried their burden of showing that a denial of immunity would appreciably impair either tribe's economic development, cultural autonomy, or self-governance.

The evidence here consists primarily of affidavits by tribal officials (submitted by the business entities) and various affidavits and supporting documentation assembled as part of an FTC investigation of AMG (submitted by the Commissioner). SFS Treasurer Robert Campbell, in particular, submitted affidavits in 2007 and 2012 in support of the motions to quash; we refer to these as the "Campbell 2007" and "Campbell 2012" affidavits. (Don Brady, MNE's chief executive officer, also submitted affidavits. But in the course of the federal investigation of AMG, MNE Services and AMG admitted that tribal officials had submitted affidavits misrepresenting the extent of the Miami Tribe's involvement in the operation of the lending businesses. Defendants have confirmed that these affidavits include the Brady affidavits; accordingly, we do not rely on them here.)

We begin with the law governing the creation of the entities, tribal intent, and stated purpose of the entities. As the Court of Appeal observed, the tribes' subsidiary entities were all created pursuant to tribal law, and the tribes have expressed their intent to extend tribal immunity to the entities. According to its articles of incorporation, SFS was formed "to facilitate the achievement of goals relating to the Tribal economy, self-government, and sovereign status of the Santee Sioux Nation," while MNE's goals include "providing for the economic development of the Tribe" and "provid[ing] opportunities for tribal members and other persons residing within the tribal jurisdiction." MNE Services' articles of incorporation list similar purposes.

As to control, the members of the Santee Sioux's governing Tribal Council serve as the SFS board of directors. MNE's board of directors is appointed by the

33

chief of the Miami Tribe with the advice and consent of the Tribal Business Committee; MNE's chief executive officer, in turn, appoints the board of MNE Services. The Miami Tribe wholly owns MNE, which in turn wholly owns MNE Services; the Santee Sioux Nation wholly owns SFS.

Notwithstanding these formal arrangements, significant evidence suggests that in fact neither SFS nor MNE Services, much less the Miami Tribe or Santee Sioux, maintains operational control over the underlying lending businesses.

Both SFS and MNE Services have relied heavily on outsiders to manage their online deferred deposit lending businesses since those businesses were founded. The entities currently have contracts with AMG, a tribal corporation owned by the Miami Tribe. Shortly after its formation in 2008, AMG acquired CLK Management, the firm previously owned by Scott and Blaine Tucker that initially registered the trademarks for the online lenders. Both Tucker brothers were authorized to sign checks on behalf of AMG, and of the 10,000 check images reviewed by an FTC investigator, "Scott Tucker or Blaine Tucker signed every check." "Most [of these] records spanned three years," beginning in 2008 and continuing through April 2011, when the FTC obtained them, but "some went back nine years or more." Both Scott and Blaine Tucker were also authorized to sign checks in the name of SFS and MNE Services, and they regularly did so.

Defendants nevertheless maintain that tribal officials oversee the online deferred deposit lending businesses. According to the Campbell 2012 affidavit, SFS's loans "are approved daily by an SFS officer or employee at which time the loans are 'consummated.' . . . SFS's office also houses (and SFS employs) SFS's customer service and managerial personnel, who receive and respond to correspondence and telephonic customer inquiries regarding their loan applications." Similarly, according to defendants' briefing, all applications for

loans from MNE Services "are approved by MNE on federal trust land under the sovereign jurisdiction of the Tribe."

But other evidence casts doubt on whether SFS's and MNE Services' role in approving loans indicates a significant degree of control. Documents compiled as part of the FTC investigation suggest the bulk of AMG's operations are conducted in Kansas, outside the boundaries of the Miami Tribe (in Oklahoma) and the Santee Sioux Nation (in Nebraska). In 2011, for example, AMG registered its location in Kansas, where it employed 606 individuals and paid more than $20 million in wages. Moreover, the Campbell 2012 affidavit acknowledges that "[f]rom approximately 2007 to 2011, the Santee Sioux Nation's Tribal Council was involved in an internal governance dispute, which . . . prevented the SFS Board from attaining a quorum for holding routine meetings." Campbell's affidavit does not suggest that the lack of routine board meetings led to a suspension of loan operations, and AMG paid more than $100 million in wages during the period from 2006 to 2011. The absence of oversight during this period casts doubt on Campbell's assertion that the tribally appointed leadership of SFS exercised significant control over the loan operations. Although the Court of Appeal was correct that "[a] tribal entity engaged in a commercial enterprise that is otherwise entitled to be protected by tribal immunity does not lose that immunity simply by contracting with nontribal members to operate the business," the balance of evidence suggests that the Tucker brothers exercised a high degree of practical control over the online lenders here and that the tribes were not "enmeshed in the direction and control of the business[es]." (*Gavle*, *supra*, 555 N.W.2d at p. 295.)

As to the financial relationship between the tribes and the entities, neither the Miami Tribe nor the Santee Sioux is directly liable for any judgment against the online lenders under applicable tribal laws. We also consider the degree to

35

which a judgment against the business entities, though not reaching either tribe, would affect tribal revenue. According to the Campbell affidavits, "profits earned by SFS go to the Santee Sioux to help fund government operations and social welfare programs . . . . The Santee Sioux reservation is a severely economically depressed region, and the profits generated by SFS are essential to maintaining a functioning government that is able to provide the essential government services to its members." Defendants' briefing likewise claims that profits from deferred deposit lending "enable" the Miami Tribe "to fund critical governmental services to its members, including tribal law enforcement, poverty assistance, housing, nutrition, preschool, elder care programs, school supplies, and scholarships."

Although SFS and MNE Services have asserted that their profits go to support tribal operations and programs, they conspicuously omit any mention of how much revenue actually reaches each tribe's coffers or how that income was allocated among the tribal programs mentioned in the various affidavits. The Campbell 2007 affidavit did specify how many tribal members were employed as a result of the lending businesses: "SFS's operations on the reservation helps [*sic*] provide employment to approximately 20 Tribal members." But these employment numbers do not appear in the 2012 affidavit, even as Campbell continues to assert that all loans are "consummated" at their respective offices on tribal land.

We find it significant that neither SFS nor MNE Services has stated with clarity the proportion of profits from the lending operations that flow to the tribes or the proportion of tribal revenue that those profits comprise. Moreover, there is evidence to suggest that the economic benefit to the tribes of the various lending businesses is minimal. Neither SFS nor MNE Services has provided this court or the courts below with a copy of its service agreement with its current management company, AMG. The record does include the management agreements that SFS

36

and MNE signed with UMS, the company that both entities relied upon to manage their lending businesses prior to 2008. Under those agreements, SFS and MNE each received either a minimum payment of $25,000 per month or 1 percent of revenue from deferred deposit lending operations. Although the entirety of this "royalty" was passed on to the tribes, the vast majority of revenue from the lending businesses flowed to the management company. By comparison, the Indian Gaming Regulatory Act (IGRA), the federal law governing Indian gaming, generally prohibits tribal casinos from paying management fees that "exceed 30 percent of the [casino's] net revenues." (25 U.S.C. § 2711(c)(1).)

The record does not inform us whether SFS and MNE Services agreed to a different arrangement with AMG. But there is evidence that after 2008 revenues from the lending businesses were extensively commingled with revenues from other, unrelated commercial enterprises controlled by the Tuckers, and those commingled funds could be spent at the Tuckers' discretion. Indeed, AMG issued checks that appear to be related to Scott Tucker's personal expenses, including a private residence in Aspen, Colorado, chartered flights to auto racing events, and several luxury automobiles.

It is instructive to compare the entities at issue here with entities that other courts have recognized as arms of their respective tribes. In *Breakthrough*, for example, the court found that the "financial relationship between the Tribe and its entities[] weigh[ed] in favor of tribal sovereign immunity" because "[o]ne hundred percent of the Casino's revenue goes to the Authority and then to the Tribe," an amount that " 'may be up to $1,000,000 per month.' " (*Breakthrough*, *supra*, 629 F.3d at pp. 1194–1195, italics omitted.) Unlike the UMS contracts, the financial arrangement in *Breakthrough* provided for no minimum payment; any shortfall in the business operations of the casino would mean reduced income for the Tribe. (*Ibid.*) In addition, under the IGRA, revenues from tribal gaming must be "used

37

only" for purposes directly benefitting the tribe or else donated to charitable organizations. (25 U.S.C. § 2710(b)(2)(B); see *Trudgeon*, *supra*, 71 Cal.App.4th at p. 640 [relying in part on the IGRA to hold that Cabazon Bingo served the tribe's stated purpose of economic development].)

In this case, we do not know what percentage of revenue from the lending businesses currently flows to the tribes, and the evidence we have (from the UMS contracts) suggests it is very small. Moreover, there is no regulatory framework like the IGRA that dictates the stream of revenues from lending businesses to the tribes. When examined in the context of SFS's and MNE Services' operations, the assertions in the tribal declarations are too vague and conclusory to establish that a judgment against the entities would appreciably impair tribal revenues. The Commissioner has adduced considerable evidence that SFS and MNE Services function as intermediaries to commercial enterprises that have only a minimal financial relationship with the tribes. Neither MNE Services nor SFS has carried its burden of demonstrating practical control by either tribe or a close financial relationship between either tribe and the lending businesses. This shortcoming also suggests that those businesses, in practice, do not meaningfully serve the purpose of "provid[ing] for the economic development of the Tribe," "provid[ing] opportunities for tribal members and other persons residing within the tribal jurisdiction," or "creat[ing] and stimulat[ing] the Tribe's economy and . . . creat[ing] employment opportunities for tribal members."

Thus, with respect to three of the five *Breakthrough* factors — purpose, control, and financial relationship — the evidence does not suggest that immunity would serve to meaningfully promote tribal economic development, cultural autonomy, or self-governance, i.e., "the purposes of tribal sovereign immunity." (*Breakthrough*, *supra*, 629 F.3d at p. 1181.) As to the other two factors — method of creation and tribal intent — both appear to weigh in favor of immunity. (*Ante*,

38

at p. 33.) But closer scrutiny of SFS's and MNE Services' origins casts the method-of-creation factor in a different and equivocal light. The initial capital for the various online lending businesses came from UMS, the management company that operated the businesses until replaced by AMG in 2008. Four of the five trademarks under which SFS and MNE Services operated their lending businesses — Ameriloan, United Cash Loans, U.S. Fast Cash, and One Click Cash — were registered by a nontribal entity, CLK Management. Although CLK Management attested to having used these marks commercially as early as 2002, it did not transfer the marks to MNE and SFS until 2006, after CLK Management had received a desist and refrain order from the Commissioner targeting its deferred lending operations. In essence, the capital and intellectual property on which SFS's and MNE Services' lending businesses were founded did not come from either tribe. Instead, they came from an outside commercial entity that continued to play a significant role in the lending operations after SFS and MNE (and then MNE Services) formally took ownership.

Among the five factors, only tribal intent weighs unequivocally in favor of extending tribal immunity to SFS and MNE Services. But tribal intent, as expressed in the entities' articles of incorporation, reveals little about "whether the entity *acts* as an arm of the tribe so that its *activities* are properly deemed to be those of the tribe." (*Allen*, *supra*, 464 F.3d at p. 1046, italics added.) The Tribes' "self-interested and unsupported claim" that they "intended their sovereign immunity to extend to [SFS and MNE Services] cannot, without more," support immunity (*White v. University of California* (N.D. Cal., Oct. 9, 2012, No. C 12– 01978) 2012 WL 12335354, at *7, affd. *White*, *supra*, 765 F.3d 1010), and such a formal statement of immunity is not sufficient here to tip the balance in favor of immunity.

Applying the five factors discussed above, we hold that on the record before us, neither SFS nor MNE Services has shown by a preponderance of the evidence that it is entitled to tribal immunity as an arm of its affiliated tribe.

**V.**

Having clarified the legal standard and burden of proof for establishing arm-of-the-tribe immunity, we express no view on whether the parties have had the opportunity to fully litigate their claims under that standard. The trial court may examine that issue on remand. For the reasons above, we reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

**LIU, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Miami Nation Enterprises

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 223 Cal.App.4th 21
**Rehearing Granted**

_____

**Opinion No.** S216878
**Date Filed:** December 22, 2016

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Yvette M. Palazuelos

_____

**Counsel:**

Kamala D. Harris, Attorney General, Edward C. DuMont, State Solicitor General, Janill L. Richards, Principal Deputy State Solicitor General, Sara J. Drake, Assistant Attorney General, Jennifer T. Henderson, Timothy M. Muscat and William P. Torngren, Deputy Attorneys General; Uche L. Enewali and Mary Ann Smith for Plaintiff and Appellant.

Seth E. Mermin, Thomas Bennigson, Daniel Osborn and Celine Cutter for Center for Responsible Lending, Community Legal Services in East Palo Alto, Housing and Economic Rights Advocates, Law Foundation of Silicon Valley, East Bay Community Law Center and Public Good Law Center as Amici Curiae on behalf of Plaintiff and Appellant.

Fredericks, Peebles & Morgan, John Nyhan, Nicole E. Ducheneaux, Conly J. Schulte; Dorsey & Whitney and Vernle C. ("Skip") Durocher, Jr., for Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jennifer T. Henderson
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 94244-2550
(916) 324-5366

John Nyhan
Fredericks, Peebles & Morgan
2020 L Street, Suite 250
Sacramento, CA 95811
(916) 441-2700

Vernle C. ("Skip") Durocher, Jr.
Dorsey & Whitney
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
(612) 340-2600