Filed 5/20/25; modified and certified for publication 6/10/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| UNITED INDIAN HEALTH SERVICES, INC. / TRIBAL FIRST,<br><br>    Petitioner,<br><br>v.<br><br>WORKERS' COMPENSATION APPEALS BOARD and DEBORAH HEMSTEAD,<br><br>    Respondents. | A170950<br><br><br>(No. ADJ10124964) |

Deborah Hemsted filed a workers' compensation claim against her employer, United Indian Health Service.  United Indian petitioned for a writ of review, challenging a Workers' Compensation Appeals Board decision denying reconsideration of an order by the administrative law judge that rejected United Indian's claim of tribal sovereign immunity.  Having previously granted United Indian's petition for a writ of review, we now reverse the Board's decision.

1

## A.

Because Indian tribes are separate sovereigns, they are immune from suit in state and federal courts absent waiver or congressional abrogation.  (*See People v. Miami Nation Enterprises* (2016) 2 Cal.5th 222, 234 (*Miami Nation*); *Self v. Cher-Ae Heights Indian Community of Trinidad Rancheria* (2021) 60 Cal.App.5th 209, 213 (*Cher-Ae Heights*).)  In addition to protecting tribes from the burdens of litigation, immunity serves the interests of tribal self-sufficiency, self-governance, and economic development.  (*Miami Nation*, at p. 235; *Cher-Ae Heights*, at p. 213.)

Tribal immunity may also extend to an entity that is affiliated with an Indian tribe but is not itself a tribe.  (*Miami Nation*, *supra*, 2 Cal.5th at pp. 237, 239, 244-248.)  To determine whether a tribal affiliate should be considered an "arm of the tribe" and therefore entitled to the tribe's immunity, courts consider five factors that assess the relationship and organizational proximity between the tribe and the entity.  (*Id.* at pp. 244-248.)  The arm-of-the-tribe inquiry examines (1) the affiliate's method of creation; (2) whether the tribe intended to share its immunity; (3) the affiliate's purpose; (4) the level of control exercised by the tribe over the affiliate; and (5) the financial connection between the tribe and the affiliate.  (*Ibid.*; *see also In re Internet Lending Cases* (2020) 53 Cal.App.5th 613, 625 (*Internet Lending Cases*).)  These factors are assessed based on the circumstances existing at the time of the trial court's decision.  (*See Miami Nation*, at pp. 250-251; *Internet Lending Cases*, at p. 623.)  The entity asserting immunity has the burden of establishing its claim by a preponderance of the evidence.  (*Miami Nation*, at p. 248.)

No one factor is dispositive.  (*See Miami Nation*, *supra*, 2 Cal.5th at p. 248.)  The closer the link between the affiliate and

the tribe, both formally and practically, the more likely the affiliate is to be protected by the tribe's immunity. (*Id*. at p. 245.) On the other hand, there are some " 'situations in which a tribal entity may engage in activities . . . so far removed from tribal interests that it no longer can legitimately be seen as an extension of the tribe itself.' " (*Id*. at p. 250.) Ultimately, the five factors reflect the principle that sovereign immunity should be extended to tribal entities when doing so would, as a practical matter, promote the federal policy of tribal self-governance and self-sufficiency. (*Ibid*.)

Miami Nation illustrates the application of the arm-of-the-tribe test. It considered whether payday lending companies affiliated with Indian tribes were protected by tribal immunity. (*Miami Nation*, *supra*, 2 Cal.5th at pp. 229, 250.) Our Supreme Court held that the affiliates were not entitled to immunity because, although the tribes intended to share their immunity, the tribes "relied heavily on outsiders" to both create and manage the lending businesses. (*Id*. at pp. 252, 255-256.) The record "contain[ed] scant evidence that [the] tribe[s] actually control[], oversee[], or significantly benefit[] from the underlying business operations of the online lenders." (*Id*. at p. 251.) As for the financial relationship, the evidence suggested that the tribes received only "minimal" economic benefit from the lending businesses, and the tribes would not be directly liable for any judgment against the businesses. (*Id*. at pp. 253-254.) Given that the record did not reflect meaningful tribal control or a close financial relationship, the businesses also were unlikely to actually achieve their stated purposes of contributing to tribal economic development and creating opportunities for tribal members and residents. (*Id*. at p. 255.) As a result, on balance, granting immunity to the lending companies would not further tribal self-governance. (*Id*. at p. 251.)

**B.**

The Indian Self-Determination and Education Assistance Act of 1975 (the Indian Self-Determination Act; 25 U.S.C. § 5301 et seq.) reflects a national policy of advancing Native American autonomy and control. (*See Yellen v. Confederated Tribes of Chehalis Reservation* (2021) 594 U.S. 338, 344 (*Confederated Tribes of Chehalis*).) Congress recognized "the obligation of the United States to respond to the strong expression of the Indian people for self-determination by assuring maximum Indian participation in the direction of . . . Federal services to Indian communities." (25 U.S.C. § 5302(a); *see also* 25 U.S.C. § 5301(a)(1).) Accordingly, the Indian Self-Determination Act seeks to shift responsibility for the administration of federal Indian benefits from the federal government to Native American organizations themselves. (*See* 25 U.S.C. § 5302(b); *Confederated Tribes of Chehalis*, at p. 344; *see also Cook Inlet Treaty Tribes v. Shalala* (9th Cir. 1999) 166 F.3d 986, 988.) The Indian Self-Determination Act authorizes an "Indian tribe" to request that the federal government enter into a self-determination contract with a tribal organization, which would contract to deliver health services or other programs to members of the tribe using federal funds. (*See Confederated Tribes of Chehalis*, at p. 344; *see also* 25 U.S.C. § 5321(a).)

The Indian Self-Determination Act recognizes that Indian tribes may form coalitions or "[i]nter-tribal consorti[a]" to "participat[e] in self-governance" in the area of Indian health, including through a tribal organization. (25 U.S.C. § 5381(a)(5).) A " 'tribal organization' " includes "the recognized governing body of any Indian tribe," as well as "any legally established organization of Indians which is controlled, sanctioned, or chartered by such governing body or which is democratically elected by the adult members of the Indian community to be served by such organization and which includes the maximum

4

participation of Indians in all phases of its activities." (25 U.S.C. § 5304(l).)

A tribal organization may "perform services benefiting more than one Indian tribe" pursuant to a self-determination contract, so long as each tribe first approves the relevant contract or grant. (25 U.S.C. § 5304(l).) The tribal organization may also engage subcontractors to carry out the self-determination contract. (*See, e.g.*, 25 U.S.C. § 5321(a)(2) [requiring that a contractor ensure "adequate competition for subcontracting"]; 25 C.F.R. § 900.49 [setting standards for subcontracts]; 25 C.F.R. § 900.50 [addressing federal laws applicable to subcontractors]; 25 C.F.R. § 900.189 [referring to "Indian contractors such as those under subcontract with the California Rural Indian Health Board"].)

Nothing in the Indian Self-Determination Act impairs or diminishes a tribe's sovereign immunity. (25 U.S.C. § 5332(1).) Further, where "an Indian tribe has authorized another Indian tribe, an inter-tribal consortium, or a tribal organization to plan for or carry out programs, services, functions, or activities (or portions thereof) on its behalf under this title" on Indian health, "the authorized Indian tribe, inter-tribal consortium, or tribal organization shall have the rights and responsibilities of the authorizing Indian tribe (except as otherwise provided in the authorizing resolution or in this title)." (25 U.S.C. § 5381(b).)

## C.

As relevant here, 18 tribes formed a tribal organization called the California Rural Indian Health Board (Indian Health Board). The member tribes have authorized the Indian Health Board to enter into self-determination agreements with the federal government to provide health services for tribes. The Indian Health Board is authorized to work with subcontractors to "perform[] the obligations of the [Indian Health Board]" pursuant

5

to a self-determination agreement. (*See* 25 U.S.C. § 5329(a)(1), (c).) United Indian is one such subcontractor.

Under the self-determination contract, the Indian Health Board receives funds from the federal government and distributes them to subcontractors. (*See* 25 U.S.C. § 5329(a)(1), (c).) Any subcontract entered into by the Indian Health Board must specify in writing the work to be performed and the terms of the contract. (*See* 25 U.S.C. § 5329(a)(1), (c).) The Indian Health Board must also manage the operations and monitor the day-to-day activities conducted pursuant to the contract. (*See* 25 U.S.C. § 5329(a)(1), (c).)

As a subcontractor, United Indian works closely with the Indian Health Board. At least nine federally-recognized tribes, all members of the Indian Health Board, passed resolutions authorizing the Indian Health Board to contract with United Indian to provide health care services to tribe members. The resolutions identify the Indian Health Board as a tribal organization or entity but do not expressly identify United Indian as a tribal organization, with the exception of a resolution of the Yurok tribe, which specifically describes United Indian as a "legally established organization of Indians which currently sub-contracts with [the Indian Health Board] . . . to provide Indian health care services."[1]

United Indian is a non-profit corporation established under California law. It was created by several tribes to provide healthcare services to the Indian people in and around Del Norte and Humboldt Counties. According to its bylaws, United Indian's

---

[1] United Indian does not contend that it qualifies as a " 'tribal organization' " under the Indian Self-Determination Act as a "legally established organization of Indians which is . . . sanctioned . . . by" the governing body of a tribe (in this case, by resolution). (*See* 25 U.S.C. § 5304(l); *see also* 25 U.S.C. § 5381].) We therefore do not address that question.

6

goals include improving Indian health, raising awareness among Indians of available health services, helping to develop local, state, and federal Indian health policies, and expanding access to dental health programs and to health services for Indian mothers and children.

United Indian is managed by a board of directors comprised of a member and an alternate appointed by each federally recognized tribal government "within the corporation," as well as five elected members plus alternates from designated Indian Community Representative voting areas; the alternates vote when a member is absent. To be a member of the board or to vote in corporate elections, the individual must be an "American Indian" registered to receive services from United Indian.

## D.

Hemsted's claim is based on an injury she sustained in 2014, when she was a medical assistant for United Indian. Hemsted first received benefits and treatment for her injury through United Indian's tribal workers' compensation system. After a dispute arose, however, Hemsted filed a claim with the state workers' compensation system. United Indian took the position that, in light of its tribal immunity, California's workers' compensation system lacked jurisdiction to adjudicate the claim.

In a March 2024 decision, the workers' compensation administrative law judge (ALJ) rejected United Indian's claim of sovereign immunity after applying *Miami Nation*'s five-factor arm-of-the-tribe test.

With respect to United Indian's method of creation, the ALJ found that it was a California non-profit created through the Indian Health Board and authorized by several tribes, including federally recognized tribes, to provide health services to their members. The ALJ observed that eight or nine tribes have sanctioned United Indian as their health provider. The ALJ

7

noted that most of the tribal resolutions did not specifically designate United Indian as a tribal organization. Based on these circumstances, the ALJ concluded that United Indian's method of creation weighed against sovereign immunity.

As to the question of intent, the ALJ found no evidence that the tribes intended to share their sovereign immunity with United Indian.

The ALJ held that United Indian's purpose—to serve the health needs of Indians in Humboldt and Del Norte Counties—weighed in favor of sovereign immunity.

As for control, the ALJ concluded that "[c]ontrol weighs against sovereign immunity because the Board [of Directors of United Indian] consisted of tribal members and others who may or may not be tribal members."

With respect to the financial relationship between United Indian and the tribes, the ALJ found United Indian was not funded by the tribes, but instead by grants obtained by the Indian Health Board and distributed to United Indian. The ALJ reasoned that, because United Indian is incorporated separately from the tribes, "any action against [United Indian] would not threaten the tribes' resources, nor the resources of the members of the board." The judge therefore concluded that this factor weighed against immunity.

In her report on reconsideration, the ALJ recommended that the Board deny United Indian's request for reconsideration. The ALJ appeared to change her view on the funding factor, stating: "Defendant's argument on Reconsideration with regard to funding is well made. The[ir] point [that] any monies lost through suit would not be available to [United Indian] to provide medical treatment to the tribes weighs in favor of sovereign immunity." However, the ALJ's overall assessment remained

8

that United Indian had failed to establish its entitlement to sovereign immunity.

Denying United Indian's reconsideration request, the Board adopted and incorporated the ALJ's report on reconsideration.[2] The Board found no abuse of discretion in the ALJ's rejection of United Indian's claim of sovereign immunity.

## DISCUSSION

Whether sovereign immunity applies to an entity is a question of law reviewed de novo. (*Miami Nation, supra,* 2 Cal.5th at p. 250.) We also apply the de novo standard when interpreting written instruments, except to the extent that the interpretation turns on conflicting extrinsic evidence. (*See Internet Lending Cases, supra,* 53 Cal.App.5th at p. 622; *Campo Band of Mission Indians v. Superior Court* (2006) 137 Cal.App.4th 175, 183.)

Turning to the five *Miami Nation* factors, we conclude that the Board and ALJ erred in denying sovereign immunity.

*Method of Creation*

Considering both the law and the circumstances under which United Indian was formed (*Miami Nation, supra,* 2 Cal.5th at pp. 245-246), the method of creation factor weighs somewhat in favor of sovereign immunity.

As the ALJ found, several tribes established United Indian and authorized it via tribal resolution to be their local health care provider as a subcontractor to the Indian Health Board pursuant to a self-determination contract under the Indian Self-Determination Act. This was not a situation in which a tribe absorbed an independent commercial enterprise previously unaffiliated with a tribe, as was the case in *Internet Lending*

---

[2] Because the Board adopted and incorporated the ALJ's report, our discussion refers to the ALJ's findings.

9

Cases.  (*See Internet Lending Cases*, *supra*, 53 Cal.App.5th at p. 626; *see also Miami Nation, supra*, 2 Cal.5th at p. 246.)  Instead, the formation of United Indian served to further self-sufficiency and self-governance by ensuring that the tribes' health care services were administered and managed by tribal organizations rather than by the federal government.  (*See* 25 U.S.C. § 5302(b).) Although United Indian was organized under state law rather than tribal law, which generally weighs against immunity (*Miami Nation*, at pp. 245-246), the ALJ properly concluded that that fact is not dispositive (*see Ito v. Copper River Native Ass'n* (Alaska 2024) 547 P.3d 1003, 1023 (*Copper River*); *cf. Confederated Tribes of Chehalis, supra*, 594 U.S. at p. 358 [holding that Alaska Native Corporations are "Indian Tribes" under the Indian Self-Determination Act]).

In analogous circumstances, the Alaska Supreme Court recently held that, where several member tribes created a nonprofit corporation to provide health care using tribal funds under the Indian Self-Determination Act, the circumstances of the entity's creation weighed slightly in favor of immunity notwithstanding its formation under state law.[3]  (*Copper River, supra*, 547 P.3d at pp. 1023-1024; *see also Manzano v. S. Indian Health Council, Inc.* (S.D. Cal. July 7, 2021, No. 20-cv-02130-BAS-BGS) [nonpub. opn.] (*Manzano*); *Wilson v. Alaska Native Tribal Health Consortium* (D. Alaska 2019) 399 F. Supp.3d 926, 933 (*Wilson*); *Matyascik v. Arctic Slope Native Ass'n, Ltd.* (D. Alaska Aug. 5, 2019, No. 2:19-cv-0002-HRH) [nonpub. opn.]

---

[3] In *Miami Nation*, our Supreme Court noted that Alaska courts had taken a different approach to the test for tribal sovereign immunity, treating the financial relationship factor as a threshold and therefore potentially dispositive inquiry.  (*See Miami Nation, supra*, 2 Cal.5th at pp. 237-238.)  In *Copper River*, however, the Alaska Supreme Court overruled that approach and adopted a five-factor test mirroring the one endorsed in *Miami Nation*.  (*See Copper River, supra*, 547 P.3d at pp. 1015-1022.)

(*Matyascik*).)  Similarly here, the circumstances of United Indian's creation has a mixed impact on our inquiry but tips toward immunity.

*Intent*

The ALJ concluded the tribes had no intent to share their sovereign immunity with United Indian.  The record contained no tribal documents stating the tribes' intent to extend sovereign immunity to United Indian.  (*See Miami Nation*, *supra*, 2 Cal.5th at p. 246.)  Instead, the ALJ noted tribal resolutions that explicitly recognize that the *Indian Health Board* is a tribal organization under the Indian Self-Determination Act, which confers upon the Indian Health Board the same rights and responsibilities as those held by the tribes themselves.  (*See* 25 U.S.C. § 5332(1).)  Apart from a resolution of the Yurok Tribe, which recognizes that "United Indian Health Services, Inc. . . . , is a legally established organization of Indians," the resolutions do not address the tribal organization status of United Indian, a subcontractor to the Indian Health Board.  Nor does the record contain documents directly indicating the Indian Health Board intended to share its immunity with United Indian.  Because the burden of proof is on the entity claiming immunity, a silent record generally weighs against immunity.  (*Miami Nation*, at p. 246.)

We note, however, that even absent express statements of a tribe's intent, tribal intent may be inferred from the tribe's actions or other circumstances.  (*Miami Nation*, *supra*, 2 Cal.5th at p. 246.)  And as United Indian asserts, it may be possible to infer the intent to share tribal immunity based on the fact that the tribes established and sanctioned United Indian to provide healthcare services to tribe members under a federal system intended to further tribal self-governance.  (*See, e.g., Copper River*, 547 P.3d at p. 1025; 25 U.S.C. § 5381).  Accordingly,

11

although the ALJ's conclusion is reasonable, based on the scant evidence available, it weighs only somewhat against immunity.

*Purpose*

We agree with the ALJ that United Indian's provision of health care serves a purpose central to tribal self-sufficiency and self-governance, weighing in favor of sovereign immunity. (*See, e.g.*, *Ransom v. St. Regis Mohawk Educ. & Community Fund* (N.Y. 1995) 86 N.Y.2d 553, 560.) In cases where a tribal entity provides health services to tribe members pursuant to the Indian Self-Determination Act, other courts have given strong weight to this factor. (*See, e.g.*, *Copper River*, *supra*, 547 P.3d at pp. 1022-1023; *Wilson*, *supra*, 399 F. Supp. 3d at p. 934; *Barron v. Alaska Native Tribal Health Consortium* (D. Alaska 2019) 373 F. Supp. 3d 1232, 1240 (*Barron*); *see also Skull Valley Health Care, LLC v. Norstar Consultants LLC* (D. Utah Aug. 2, 2023, No. 2:22-cv-00326) [nonpub. opn.] (*Skull Valley Health Care*); *Manzano*, *supra*, 20-cv-02130-BAS-BGS; *Matyascik*, *supra*, 2:19-cv-0002-HRH.)

*Tribal Control*

The control factor also weighs in favor of sovereign immunity. The tribes participate in the management and control of United Indian in at least three respects.

First, under United Indian's bylaws, each participating tribe that is federally recognized shall select a representative to serve a term of office on the Board of Directors designated by the tribe. The Board of Directors "control[s], oversee[s], and conduct[s] the affairs and business" of United Indian, hires and removes employees, and does "whatever else may be necessary in the conduct of the business of the corporation in order to accomplish its purpose." Shirley Laos, a tribal representative on the Board of Directors at the time she testified, confirmed that the Board of Directors does in practice oversee United Indian, by,

for example, voting on resolutions, approving insurance contracts, receiving reports, and discussing litigation.

Second, pursuant to each tribe's authorizing resolution, the tribes retain approval power over the contracts between United Indian and the Indian Health Board for provision of health care services. (*See* 25 U.S.C. § 5304(l).)

Third, as a party to a self-determination agreement, the Indian Health Board, a tribal organization, must manage the day-to-day operations, manage all funds, and monitor all activities conducted under the agreement, although the record does not indicate how closely the Indian Health Board monitors those activities in practice. (*See* 25 U.S.C. § 5329(a)(1), (c); *see also Miami Nation, supra*, 2 Cal.5th at p. 250 [explaining that "arrangements on paper do not necessarily illuminate how businesses operate in practice"].)

The ALJ reasoned that the control factor weighs against sovereign immunity "because the Board [of Directors] consisted of tribal members and others who may or may not be tribal members." This was legal error. As Hemsted herself explained, the tribes appoint a majority (nine) of the board members. The fact that they do not appoint the remaining five does not undercut the tribes' majority control of the board or the other ways, discussed above, in which they may exercise control. (Cf. *Miami Nation, supra*, 2 Cal.5th at p. 247 ["[a]n entity's decision to outsource management to a nontribal third party is not enough, standing alone, to tilt th[e] [control] factor against immunity."])

*Financial Relationship*

Finally, the financial relationship factor likewise weighs in favor of immunity. *Miami Nation* makes clear that where a judgment against the tribal entity would significantly reduce tribal resources, sovereign immunity is appropriate, even if the

13

tribe's treasury is not directly affected. (*Miami Nation, supra*, 2 Cal.5th at pp. 247-248; *see also Copper River, supra*, 547 P.3d at p. 1025.) The ALJ found that United Indian is funded by the Indian Health Board, which receives federal funding through a self-determination agreement. As the ALJ further noted, a judgment against United Indian would reduce the money available to provide medical treatment to tribal members. Thus, subjecting United Indian to liability for state workers' compensation claims (and potentially other types of claims, if tribal immunity is denied) would undercut United Indian's ability to carry out its self-governance purpose and reduce funds available for tribal health care. (*See Copper River*, at pp. 1025-1026.)

In *Copper River*, the Alaska Supreme Court concluded that this factor weighed in favor of immunity where the inter-tribal non-profit health care organization received federal funding, for the benefit of its member tribes, to provide health care services for tribe members. (*Copper River, supra*, 547 P.3d at p. 1026.) Even though the organization's non-profit status meant the tribes themselves were formally insulated from a judgment against the organization, such a judgment would undermine tribal self-sufficiency because it "would be effectively paid from the member tribes' federal healthcare funding." (*Ibid.*; s*ee also Wilson, supra*, 399 F.Supp.3d at p. 936; *Barron, supra*, 373 F.Supp.3d at pp. 1239-1240; *Skull Valley Health Care, supra*, No. 2:22-cv-00326; *Manzano, supra*, No. 20-cv-02130-BAS-BGS*; Matyascik, supra*, No. 2:19-cv-0002-HRH.)

* * *

In sum, although there is no express evidence that United Indian's participating tribes intended to share their immunity, the remaining factors reflect that United Indian is an arm of the tribes that it serves. Ultimately, because United Indian's existence, purpose, and operations are central to tribal self-

14

governance, extending tribal immunity to United Indian would further the self-governance and autonomy policies that such immunity is intended to promote. (*See Miami Nation*, *supra*, 2 Cal.5th at p. 250; *Copper River*, *supra*, 547 P.3d at p. 1026; *Barron*, *supra*, 373 F.Supp.3d at pp. 1239-1240; *Skull Valley Health Care*, *supra*, No. 2:22-cv-00326; *cf. Pink v. Modoc Indian Health Project* (9th Cir. 1998) 157 F.3d 1185, 1187.) For the same reason, denying sovereign immunity to United Indian would impair tribal self-sufficiency by reducing its member tribes' health care resources. (*See, e.g., Copper River*, at p. 1026; *Matyascik*, *supra*, No. 2:19-cv-0002-HRH.) Accordingly, we hold that United Indian is entitled to sovereign immunity.

## DISPOSITION

The Board's opinion and order denying United Indian's petition for reconsideration is reversed. The matter is remanded to the Board for further proceedings consistent with this opinion.

BURNS, J.

WE CONCUR:


JACKSON, P.J.
CHOU, J.

*United Indian Health Services, Inc. / Tribal First v. Workers' Compensation Appeals Board and Deborah Hemstead (A170950)*

15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| UNITED INDIAN HEALTH SERVICES, INC. / TRIBAL FIRST,<br><br>    Petitioner,<br><br>v.<br><br>WORKERS' COMPENSATION APPEALS BOARD and DEBORAH HEMSTEAD,<br><br>    Respondents. | A170950<br><br>(No. ADJ10124964)<br><br>**ORDER CERTIFYING OPINION FOR PUBLICATION AND MODIFYING OPINION** |

**THE COURT:**

The opinion in the above-entitled matter, filed on May 20, 2025, was not certified for publication in the Official Reports. On June 6, 2025, a request for publication was received from the California Lawyers Association, Workers' Compensation Section Unpublished Cases Review Committee, pursuant to California Rules of Court, rule 8.1120(a). We accepted the request for publication for filing.

For good causing appearing, this court grants the publication request and orders the opinion certified for publication pursuant to California Rules of Court, rule 8.1105(b), (c).

Pursuant to California Rules of Court, rule 8.264(c)(1), the opinion filed on May 20, 2025, shall be MODIFIED as follows:

1

1.    All introductory signals in the opinion are changed from italicized to non-italicized.

2.    On page one, a new sentence is added to the end of the first paragraph:

> Under the "arm of the tribe" test set forth in *People v. Miami Nation Enterprises* (2016) 2 Cal.5th 222, 234 (*Miami Nation*), United Indian is entitled to sovereign immunity.

3.    On page two, the citation that follows the first sentence of the first paragraph is replaced as follows:

> (See *Miami Nation, supra,* 2 Cal.5th at p. 234; *Self v. Cher-Ae Heights Indian Community of the Trinidad Rancheria* (2021) 60 Cal.App.5th 209, 213 (*Cher-Ae Heights*).)

4.    On page two, in the second paragraph, the second and third sentences are replaced with the following combined sentence and citation:

> To determine whether a tribal affiliate should be considered an "arm of the tribe" and therefore entitled to the tribe's immunity, courts examine five factors that pertain to the relationship between the affiliate and the tribe: (1) the affiliate's method of creation; (2) whether the tribe intended to share its immunity; (3) the affiliate's purpose; (4) the level of control exercised by the tribe over the affiliate; and (5) the financial connection between the tribe and the affiliate.  (*Id.* at pp. 244-248; see also *In re Internet Lending Cases* (2020) 53 Cal.App.5th 613, 625 (*Internet Lending Cases*).)

2

5.    On page eight, the fourth full paragraph is replaced in its entirety as follows:

> With respect to the financial relationship between United Indian and the tribes, the ALJ concluded that this factor weighed against immunity. The ALJ explained that United Indian was not funded by the tribes but, instead, by grants obtained by the Indian Health Board and distributed to United Indian. Also, because United Indian is incorporated separately from the tribes, "any action against [United Indian] would not threaten the tribes' resources, nor the resources of the members of the board."

6.    At the bottom of page 10, the last sentence of the last paragraph, continuing into page 11, is replaced as follows:

> Similarly, here, the circumstances of United Indian's creation have a mixed impact on our inquiry but tip toward immunity.

7.    On page 11, in the first full paragraph, the second and third sentences are replaced as follows:

> The record contains no tribal documents stating the tribes' intent to extend sovereign immunity to United Indian. (See *Miami Nation*, *supra*, 2 Cal.5th at p. 246.) By contrast, tribal resolutions explicitly recognize that the *Indian Health Board* is a tribal organization under the Indian Self-Determination Act, which confers upon the Indian Health Board the same rights and responsibilities as those held by the tribes themselves.

8.    On page 12, the first sentence of the third paragraph is replaced as follows:

> First, under United Indian's bylaws, each participating tribe that is federally recognized

3

selects a representative to serve a term of office on the Board of Directors designated by the tribe.

9.   In the same paragraph identified in item 8, the third sentence is replaced as follows:

Shirley Laos, a tribal representative on the Board of Directors, confirmed that the Board of Directors does in practice oversee United Indian by, for example, voting on resolutions, approving insurance contracts, receiving reports, and discussing litigation.

The modifications make no change to the judgment.

BURNS, J.

WE CONCUR:

JACKSON, P.J.
CHOU, J.

*United Indian Health Services, Inc. / Tribal First v. Workers' Compensation Appeals Board and Deborah Hemstead (A170950)*

Workers' Compensation Appeals Board Case No. ADJ10124964.

Michael Arthur Robinson for Petitioner.

Workers' Compensation Appeals Board, James Thomas Losee, for Respondent Workers' Compensation Appeals Board.

Deborah Hemstead, in pro. per., for Respondent Deborah Hemstead.